UNITED STATES of America, Appellee,

v.

Godfrey BREVARD, Appellant.

No. 83–5231.

United States Court of Appeals,
Fourth Circuit.

Argued June 8, 1984.

Decided July 27, 1984.

Thomas W. Ullrich, Alexandria, Va., for appellant.

Thomas M. Buchanan, Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief), for appellee.

Before WINTER, Chief Judge, PHILLIPS, Circuit Judge, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

Godfrey Brevard appeals from a judgment convicting him of armed bank robbery in violation of 18 U.S.C. § 2113(a), (d). Because of a government witness's repeated references to a polygraph examination of Brevard, we reverse.

I

The robbery took place at approximately 9:35 a.m. on May 11, 1983, when four men entered a bank in Alexandria, Virginia. Two of the men acted as lookouts, while the other two took money from teller drawers and placed it in gym bags. The four men then fled in a car, later identified through the license tag as Brevard's.

At trial, Brevard relied on an alibi defense. He testified that on the morning of the robbery he had an appointment to discuss an unrelated civil matter at small claims court in Washington, D.C. He testified that he left the courthouse in Washington at 9:20 or 9:25, walked to his apartment to change clothes, and arrived on foot at work at about 10:15. A clerk at the small claims court testified that Brevard waited patiently for a court officer, that he did not seem to be in a hurry, and that he

left between 9:20 and 9:30. His supervisor confirmed that Brevard arrived at work at about 10:15.

The government did not dispute the testimony of the court clerk or Brevard's supervisor. It contended, however, that Brevard could have participated in the bank robbery between his departure from the court and his arrival at work. According to the government's theory, Brevard could have been met outside the courthouse at 9:20 or 9:25, driven to Alexandria for the robbery, and arrived at work by 10:15. Brevard's accomplices could have dropped him at his office and returned the car to his apartment. The government introduced evidence that the time and distance involved made this theory plausible. It also presented evidence indicating that, because of the distance of his route, Brevard could not have walked home from the courthouse, changed his clothes, and walked to work in 50 or 55 minutes.

Although the government proved that Brevard's car was used in the robbery, a woman—not Brevard—was the driver. Five bank employees identified Brevard as one of the robbers, but they had little opportunity to see him and their testimony disclosed many inconsistencies. Other bank employees were unable to identify him. No money was traced to Brevard, and his fingerprints were not found in the bank. He contacted the FBI when he received a message that an agent wished to question him about the robbery.

The references to a polygraph test were made by an FBI agent who had interviewed Brevard after the robbery. The agent testified that he met Brevard at work and that they went to inspect Brevard's car, which was parked near his apartment. He then described, on direct examination, what followed:

Q Now, where did you take the defendant at that point?

A We then took him back to the Washington field office, because he had voluntarily consented to a polygraph examination. I didn't know at that time whether to believe his story or not.

Q Now, when you got back to the FBI building, do you recall if the defendant made any further statements about the whereabouts of his car on May 11, 1983?

A The defendant, throughout the thing, maintained that he had thought his car was parked at his residence up there, but at the conclusion of the interview when—just before he went in for the polygraph examination when I asked him, "I don't understand why you just don't tell us who had the car," he says to me that he wasn't going to tell us who had his vehicle.

The court then recessed for lunch, and upon convening, the following colloquy took place in the absence of the agent and the jury:

[Defense attorney]: Your Honor, there is one thing I did want to put on the record before the jury comes back. That is this matter with regard to the polygraph test. I don't know if the jury has gathered the inference or not because there was a statement made that they hadn't decided up to that point to charge him and then he took the polygraph test. The inference would be drawn from that that as a result of that test it persuaded them to seek a charge against Mr. Brevard.

THE COURT: That was a very unfortunate remark. The agent should know better.

[Prosecutor]: Your Honor, for the record, I instructed him not to mention—

THE COURT: It was a very stupid thing to do and a little too clever to try to help the government's case along.

[Prosecutor]: I don't know if that was his intent.

THE COURT: I don't know whether it was either, but he is too experienced a police officer to do it inadvertently.

[Defense attorney]: On behalf of my client I would like to move for a mistrial for the record on that basis, your Honor.

THE COURT: No. I will deny the motion for a mistrial. Unless you feel it

would enhance the attention given to it I will instruct the jury to disregard it.

[Defense attorney]: I am afraid it would enhance it at this point.

THE COURT: The motion will be denied.

Bring the jury in.

But that agent ought to have known better. There is no question in my mind but that it was done deliberately.

Again the agent referred to the polygraph test, this time on cross-examination:

Q So he told you in that statement which you recorded who did drive his car, didn't he? He told you that his mother, Dessie Brevard; his brother-in-law; and himself. Didn't he tell you that?

A That is what he told me when I interviewed him at that time, yes, sir.

Q Isn't that completely inconsistent with your allegation today that he also said he wasn't going to tell you who drives his car?

A He didn't tell me that until much later when we were in the office, and it was a response type of thing where he was getting ready to go in and take the polygraph examination, and I had basically been done interviewing him. I don't know why he wasn't telling us—

THE COURT: Would counsel approach the bench for just a minute?

(At the bench:)

THE COURT: One more injection into this case and I am not only going to declare a mistrial, I am going to consider finding this witness in contempt. He is an experienced police officer. If there is any chance of his repeating it, you go tell him right now. I don't want any more reference to that. You told me that you had already told him that.

[Prosecutor]: I told him, Judge.

THE COURT: Tell him again.

After the third reference, the judge instructed the jury to disregard the remarks:

Members of the jury, there has been mention of a polygraph. That hasn't anything to do with this case, the defendant's taking it or non-taking it. You must not draw any inference that because he did take it or he didn't take it that there is any inference of guilt whatsoever to be drawn from that. It has no relevance in this case. You should not draw any inference against the defendant because reference to a polygraph has been made.

II

■ Evidence that the accused or a witness has taken a polygraph test is inadmissible. *See United States v. Holman*, 680 F.2d 1340, 1351–52 (11th Cir.1982). Where an impermissible reference to a polygraph has been interjected, the court usually may cure the error by striking the evidence and instructing the jury to disregard it. *See, e.g., Holman*, 680 F.2d at 1352; *United States v. Smith*, 565 F.2d 292, 295 (4th Cir.1977). Curative instructions, however, are not always adequate. There are instances where the jury is exposed to inadmissible evidence which could make such a strong impression that instructions to disregard it may not remove its prejudicial effect. *See Bruton v. United States*, 391 U.S. 123, 129–35, 88 S.Ct. 1620, 1624–27, 20 L.Ed.2d 476 (1968); *Throckmorton v. Holt*, 180 U.S. 552, 567, 21 S.Ct. 474, 480, 45 L.Ed. 663 (1901).

■ The most important questions to consider in determining whether a curative instruction or a mistrial is appropriate after a reference to a polygraph test are these: (1) whether an inference about the result of the test may be critical in assessing the witness's credibility, and (2) whether the witness's credibility is vital to the case. *See State v. Edwards*, 412 A.2d 983, 985 (Me.1980). Obviously, when the witness is a defendant who asserts an alibi, the answers to these questions assume added significance.

■ In this case, the jury could have drawn an inference from the polygraph references that was damaging to Brevard. The FBI agent who made the remarks testified that, before going to the FBI office with Brevard for the polygraph test, "I didn't know at that time whether to believe

his story or not." Because the FBI had not charged Brevard before the visit, and he was subsequently indicted, the jury could have inferred that the decision to proceed against him was based partly on the results of the polygraph test and that Brevard had failed it. This inference could have been critical in undermining Brevard's credibility.

This inference could have been especially prejudicial to Brevard because his credibility was a vital issue at trial. Apart from the testimony of some eyewitnesses, which was in certain particulars inconsistent, the evidence against Brevard was circumstantial and partially conjectural. Brevard had an honorable discharge from the Navy. He had worked at the Government Printing Office and was currently employed by the Internal Revenue Service. His counsel elicited testimony from FBI agents that Brevard had cooperated fully with them. The clerk at small claims court, Brevard's supervisor, and the woman with whom he lived corroborated the parts of his account within their knowledge. But, in the end, his defense rested on the jury's willingness to believe his seemingly plausible description of his activities on the morning of the robbery in the face of plausible conflicting evidence.

The government argues that this court's decision in *United States v. Smith*, 565 F.2d 292 (4th Cir.1977), requires affirmance here. In *Smith*, the government improperly questioned a witness about taking a polygraph examination. Applying the general rule, we held that a new trial was not warranted where the district judge struck the evidence and instructed the jury to disregard it. 565 F.2d at 295. In that case, however, the witness who was questioned about a polygraph test was not the defendant, and there was no indication that his credibility was an important issue. Indeed, in *Smith*, we distinguished another case which had been reversed because the polygraph evidence concerned a "crucial Government witness ... who the Government attempted to rehabilitate" by asking about a polygraph test. *Smith* did not foreclose the possibility that a new trial

might be required where, as here, the remarks about a polygraph test prejudiced a defendant whose credibility was vital to the case's outcome.

We find no error in the rulings, about which Brevard complains, pertaining to the bank employees' identification of him. The judgment of the district court is reversed, and the case is remanded for a new trial.