UNITED STATES of America, Appellee,

v.

David L. TEDDER, Appellant.

UNITED STATES of America, Appellee,

v.

David Lee ROBERTS, Appellant.

UNITED STATES of America, Appellee,

v.

Ronald Benson ROBERTS, a/k/a "BB", Appellant.

Nos. 85–5035(L), 85–5139 and 85–5140.

United States Court of Appeals,
Fourth Circuit.

Argued April 9, 1986.

Decided Sept. 29, 1986.

Rehearing and Rehearing En Banc Denied
Nov. 3, 1986 in No. 85–5035.

Charles B. Macloskie, Beaufort, S.C. and Melvin L. Roberts, York, S.C., for appellants David and Ronald Roberts.

John McIntosh, Asst. U.S. Atty. (Vinton D. Lide, U.S. Atty., Robert C. Jendron, Jr., Asst. U.S. Atty., Columbia, S.C., Donen Davis and Frank Cornely, Law Clerks, on brief), for appellee.

Before WINTER, Chief Judge, PHILLIPS, Circuit Judge, and BUTZNER, Senior Circuit Judge.

**HARRISON L. WINTER, Chief Judge:**

David L. Tedder, David Lee Roberts, and Ronald Benson Roberts were tried together before a jury and convicted of a number of offenses.[1] Tedder was convicted of conspiracy to import marijuana, conspiracy to possess marijuana with intent to distribute, conspiracy to defraud the United States, and six charges of perjury before a Grand Jury. The two Roberts, who played a subsidiary role in the drug conspiracies, were convicted of conspiracy to import marijuana and conspiracy to possess marijuana with intent to distribute.

They appeal, advancing a number of contentions why they should be acquitted or why their convictions should be reversed and a new trial ordered. With the sole exception of one of Tedder's perjury convictions, we are not persuaded that the judgments should be disturbed. We therefore affirm except for Tedder's conviction for perjury under Count 22 of the indictment. Tedder's conviction under that count is reversed.

### I.

We confine our initial statement of the facts to an overview of the government's case and to its procedural history. Other pertinent facts will be stated in our discussion of the specific contentions to which they relate.

In the early 1970's, Richard F. (Rocky) Bradford and Joseph Allen Patterson, IV (Allen Patterson) began what is known in the marijuana smuggling business as a contract off-load team. For a fee, usually a percentage of the gross proceeds from the sale of marijuana, they would provide an off-load site, security and surveillance, off-loaders, shuttle boats, trucks and warehouse facilities for others who imported marijuana into the United States. Later, they began to import their own marijuana from Jamaica and South America and arranged for its subsequent distribution through the East Coast of the United States. As the conspiracy continued on

---

1. Their codefendant, Richard McIntyre, does not appeal his conviction.

this expanded scale, it was joined by the Roberts and by Tedder. The Roberts were "employed" towards the end of the conspiracy to purchase three off-load vehicles and to weigh and distribute a load of imported marijuana upon its arrival at the "stash house," the point of warehousing or assembly. They were implicated in only the last of the importations undertaken as part of the conspiracy. Tedder, who is an attorney, was employed by Patterson and Glen Jaeckel, another co-conspirator, to launder drug proceeds through Bahamian bank accounts and to help reinvest the money in South Carolina property. Tedder joined the conspiracy in 1980 when he traveled to the Bahamas to set up trust accounts for Patterson and Jaeckel.

The Roberts and thirty-two others were named in an indictment returned on May 31, 1984. Tedder had testified before the Grand Jury, but he was not named in its first indictment. That indictment charged a conspiracy to import marijuana and a conspiracy to possess marijuana with intent to distribute, as well as a variety of substantive offenses. The Grand Jury, however, continued its investigation, and several of the original thirty-two defendants pleaded guilty and provided new information about the scope of the scheme and the identity of its participants. Patterson, himself, pleaded guilty to operating a continuing criminal enterprise and provided information about his relationship with Tedder. Patterson's sister-in-law, a lawyer in the same office as Tedder, testified before the Grand Jury after Tedder unsuccessfully sought to quash the subpoena ordering her to appear on the ground of attorney-client privilege.

Based upon this new information, the Grand Jury returned a Superseding Indictment on September 19, 1984. That indictment named four new defendants, including Tedder, and eliminated twenty-three original defendants who had pleaded guilty. Thus the new indictment named thirteen defendants. Of the thirteen, four were fugitives, five pleaded guilty, and Tedder, the Roberts and McIntyre, the nonappealing defendant, went to trial jointly.

We turn now to the contentions of the several defendants.

## II.

### David L. Tedder

Applicable solely to his case, Tedder argues that his indictment and conviction for perjury were obtained in violation of his timely-asserted attorney-client privilege because the testimony of Judith Patterson, his fellow associate in the law firm for which he worked and which represented him, was received in evidence. He also asserts reversible error in the admission of testimony that he engaged in illegal drug transactions in the early 1970's with Bradford and Allen Patterson prior to the conspiracies with which he was charged in this case. He argues that his motion for a mistrial should have been granted when Patterson, in response to cross-examination by Tedder's counsel, disclosed that he, Patterson, had been subjected to a polygraph test. He argues further that the evidence was legally insufficient to convict him of the conspiracy charges and of the perjury charges. He also contends that records of the Bank of Nova Scotia, obtained by letters rogatory, were improperly admitted into evidence because he was not afforded the opportunity to contest their trustworthiness. Further, he contends that exculpatory evidence was improperly excluded, and finally he argues that he was denied a proper jury instruction which he requested regarding the charge of conspiracy to defraud the government.

### A. Attorney-Client Privilege

Judith Patterson, the wife of Allen Patterson's twin brother, Steven, and a professional colleague of David Tedder, testified before the Grand Jury and at trial that Tedder told her that he had perjured himself in his Grand Jury appearance. Specifically, she testified that Tedder came to her office upon his return from the Grand Jury and informed her that he had "taken a calculated risk" by denying participation in certain transactions with the Bank of Nova

Scotia in the Bahamas. Shortly thereafter, Tedder and Judith Patterson traveled together to a Continuing Legal Education seminar on family law. While driving across the Dunbar Bridge between Beaufort, South Carolina and Columbia, South Carolina, Tedder admitted that he had perjured himself before the Grand Jury by denying knowledge that William J. Dunbar, the incorporator of one of the corporations under investigation, was a fictitious person. Tedder also admitted that he traveled to the Bank of Nova Scotia on behalf of co-conspirator Glen Jaeckel. Finally, Tedder acknowledged that he had assisted Allen Patterson in creating false promissory notes to disguise the expenditure of cash derived from drug smuggling. On the basis of this and other evidence, *see infra*, Tedder was convicted of five counts of perjury.

■ Tedder contends that Judith Patterson's testimony regarding his admissions was given in violation of his timely-asserted attorney-client privilege. Rule 501 of the Federal Rules of Evidence requires federal courts to apply federal common law to assertions of privilege in criminal cases.[2] *United States v. Gillock*, 445 U.S. 360, 368, 100 S.Ct. 1185, 1191, 63 L.Ed.2d 454 (1980). As the proponent of the privilege, Tedder must prove its applicability. *United States v. (Under Seal)*, 748 F.2d 871, 876 (4 Cir. 1984).

In this appeal, Tedder has asserted both direct and derivative claims of attorney-client privilege. His direct claim rests on his assertion that any inculpatory statements he made to Judith Patterson were for the purpose of securing legal advice and assistance. In addition, Tedder contends that he and Judith Patterson enjoyed an attorney-client relationship derivatively, by virtue of the fact that other members of the law firm at which they were both employed were providing him with legal ad-

vice. The district court rejected both claims of privilege, and we agree.

## 1. Direct claims of privilege

We have stated repeatedly that the attorney-client privilege is to be strictly construed, in order to harmonize it, to the extent possible, with the truthseeking mission of the legal process. *United States v. (Under Seal)*, 748 F.2d at 875; *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4 Cir.1984); *NLRB v. Harvey*, 349 F.2d 900, 907 (4 Cir.1965). Generally, "the attorney-client privilege protects from disclosure communications from a client to his attorney made in confidence and concerning legal advice sought from his attorney," *In re Special Grand Jury No. 81–1*, 676 F.2d 1005, 1008–09 (4 Cir.1982), but "the mere relationship of attorney-client does not warrant a presumptioi of confidentiality." *In re Grand Jury Proceedings*, 727 F.2d at 1356; *see also United States v. (Under Seal)*, 748 F.2d at 875.

In *NLRB v. Harvey*, a case which we continue to treat as viable, *see United States v. (Under Seal)*, 748 F.2d at 875; *In re Special Grand Jury No. 81–1*, 676 F.2d at 1009, we referred to two definitions of the attorney-client privilege. Wigmore holds the privilege to exist:

"(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." 8 Wigmore, Evidence § 2292 (McNaughton rev. 1981)

*NLRB v. Harvey*, 349 F.2d at 904. We cited a similar formulation by Judge Wyzanski in *United States v. United Shoe*

2. Federal Rule of Evidence 501 provides in relevant part:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority,

the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

*Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950):

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

*NLRB v. Harvey*, 349 F.2d at 904.

■ Notwithstanding these straightforward definitions, the existence of the privilege in this case presents complex questions of fact. These questions include whether Tedder sought to become Judith Patterson's client; whether he sought advice from her in her professional capacity; and whether he reasonably expected the communications to remain confidential, given his confidante's familial relationship with potential codefendants Allen and Steven Patterson.

The district judge who denied the motion to quash the Grand Jury's subpoena of Judith Patterson heard the testimony of several witnesses, including Tedder, Steven Patterson's lawyer, and Judith Patterson herself. Although Tedder maintained that he expected their discussions to remain confidential, he admitted that he spoke with Ms. Patterson immediately after his Grand Jury testimony in the hope that information about the apparent direction of the inquiry would assist Steven Patterson, who was also under investigation. On more than one previous occasion, Ms. Patterson had functioned as a conduit for information between Tedder and a codefendant's counsel. Finally, Tedder acknowledged that Ms. Patterson had informed him upon her return from an interview with the FBI that she had reported Tedder's admissions to the investigators because she did not believe them privileged.

Throughout her testimony, Judith Patterson maintained that Tedder understood that she was not his attorney but that she doubted that he would have told her about his false declarations before the Grand Jury had she not been a lawyer. However, she also stated that she did not believe that Tedder would have discussed this with another attorney; instead, he came to her because her husband and brother-in-law were involved and because they were friends. Significantly, Tedder shared with her information that he did not impart to those members of the firm actively engaged in his defense, and she on occasion discussed with him Allen and Steven's defense plans, although she did not participate professionally in their defense. Based on her own legal research, she stated that she did not believe that Tedder was entitled to invoke the attorney-client privilege.

Furthermore, Tedder made his incriminating statements under circumstances suggesting the non-existence of an attorney-client relationship. Although Judith Patterson was Tedder's colleague, her legal practice consisted primarily of negligence work; she had never participated in a federal criminal trial. In disclosing to her his false declarations, Tedder asked no advice but merely reported that he had perjured himself. The admissions occurred over a period of time as a part of informal conversations, e.g., driving to a legal seminar, during which Ms. Patterson took no notes. The two had previously discussed the case and shared information of which they had personal, as distinct from professional, knowledge.

In light of this evidence, we cannot conclude that the district court erred in determining that Tedder failed to carry his burden of proving the existence of a privileged attorney-client relationship. The record is consistent with the district court's findings that Tedder spoke to Judith Patterson as a friend personally involved in the case rath-

er than as a professional legal advisor, that he did not seek legal advice from her, and that he did not expect the communications to remain confidential.

### 2. Derivative claims of privilege

■ The district court also found that Tedder failed to establish a legal basis for his claim that a derivative attorney-client privilege bars the use of Judith Patterson's testimony. Tedder maintains that his undisputed attorney-client relationship with other members of the firm extends to her.

We reject Tedder's claim that Judith Patterson's employment relationship with Tedder's defense firm triggers the attorney-client privilege. In requiring her to testify, the district court did not compel disclosure of information she obtained by virtue of her position at the firm representing Tedder. Instead, the court required her to reveal the substance of Tedder's personal conversations apart from his legal defense. Just as the mere fact that Judith Patterson

was a lawyer does not create a privileged relationship, *In re Grand Jury Proceedings*, 727 F.2d at 1356; *(Under Seal)*, 748 F.2d at 875, her employment by Tedder's defense firm does not shield otherwise unprotected evidence.[3]

### B. Federal Rule of Evidence 404(b)

In order to prove that Tedder knew that he was handling the proceeds of drug sales, the government introduced evidence that, while in college in the mid 1970's, Tedder and Allen Patterson purchased marijuana for resale from Rocky Bradford, the central figure in the drug conspiracy now at issue. Over Tedder's objection, the district judge found the testimony not barred by Rule 404(b) of the Federal Rules of Evidence.[4] Consonant with the defendant's request, the judge issued limiting instructions to the jury immediately before the presentation of the Rule 404(b) evidence.[5]

**3.** By contrast, the cases on which Tedder relies uniformly concern the disqualification of a law firm or individual practitioner because of a prior representation of an adverse party, from whom the lawyer might have obtained confidential information. *See Kevlik v. Goldstein*, 724 F.2d 844 (1 Cir.1984) (district court did not abuse its discretion in disqualifying law firm representing defendant where same firm had previously represented coarrestee-plaintiff); *State of Arkansas v. Dean Foods Products Co., Inc.* 605 F.2d 380 (8 Cir.1979) (disqualification of state's counsel due to previous representation of antitrust defendant); *United States v. Kitchin*, 592 F.2d 900 (5 Cir.1979) (disqualification of defense counsel where associate had previously served as Assistant United States Attorney in the investigation); *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602 (8 Cir.1977) (representation of codefendants in prior criminal antitrust action does not bar later representation of another party in a subsequent civil antitrust suit). In the disqualification context, courts generally impute to the entire law firm any information that will disqualify an individual attorney. *Kevlik*, 724 F.2d at 849; *Dean Foods*, 605 F.2d at 385; *Kitchin*, 592 F.2d at 904; *Fred Weber*, 566 F.2d at 608. Such broad imputation is appropriate in those circumstances, in which the primary concern is that adverse parties not be unfairly disadvantaged by the inside information of opponents' counsel. Expansive enforcement of an attorney's ethical obligation to preserve client confidences does not conflict with truthseeking in the situation presented by the instant case, as

it does in true instances of attorney-client privilege.

**4.** Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**5.** During Rocky Bradford's testimony, the judge charged the jury:

Now, I want to caution you that any evidence of any other acts or deeds or conduct or crimes allegedly committed by any of these Defendants prior to the date alleged in the conspiracy or after the date of the termination of the conspiracy in '83, is not any evidence whatsoever against any Defendant that they committed the acts for which they're standing trial here today. Because the Defendants are not on trial for any act or conduct not alleged in the indictment.

The evidence, however, that a Defendant may have committed an act at one time or on one occasion, is then not admissible to prove the character of a Defendant in order to show that he acted in conformity therewith. That is, it's not any proof, as I said, against him of the acts or the crimes he's actually standing trial for.

■ A two-step analysis determines whether Rule 404(b) prohibits the introduction of evidence of extrinsic wrongs. For such evidence to be admissible, it must first be relevant to a genuine issue other than criminal disposition. *See, e.g., United States v. Masters*, 622 F.2d 83, 86 (4 Cir.1980). Next, the court must determine whether the danger of undue prejudice substantially outweighs the probative value of the evidence. *Id.* at 87. This occurs when the risk that the jury will be excited to irrational behavior is disproportionate to the probative value of the evidence. *Id.*

■ We cannot conclude that the admission of evidence of Tedder's prior drug transactions with Patterson reflected an abuse of discretion by the district court. The evidence tended to show that Tedder understood the source of Patterson's funds and thus was clearly relevant to the issue of Tedder's knowledge and intent. Although the government might have been able to convey this information to the jury without the relatively small bit of testimony concerning Tedder's marijuana sales, admission of that evidence does not seem arbitrary or capricious. Similarly, it is not apparent to us that the knowledge that Tedder had engaged in small-scale marijuana sales while in college would so inflame the jurors' emotions as to hinder their impartial consideration of the evidence. In any event, the district court's careful cautionary instructions moderated the danger of unfair prejudice under these circumstances. *See Masters*, 622 F.2d at 87–88.

However, the jury may consider evidence of alleged acts of a like nature, as evidence of the state of mind, knowledge or intent with which a Defendant did an act contained in the indictment. And that is the only relevance that this type of evidence of any other crimes or acts or wrongs would have in this case. It has to do with intent, knowledge, lack of mistake or what have you. Because the burden is upon the prosecution to prove that a Defendant willfully, knowingly, and intentionally did the acts or committed the crimes that he's standing trial for in this case.

So, all I'm saying to you is that any evidence of any of these other acts not alleged in the indictment that were allegedly done outside of the period of the indictment may be

## C. Polygraph Test

Responding to a question from Tedder's counsel regarding how long he had spoken to federal agents, Allen Patterson testified that he "had spent twenty hours on the polygraph." Following this statement, the jury was excused, and Tedder's counsel moved for a mistrial, which the district court denied. The judge repeatedly offered a curative instruction, which the defendant refused.

■ While evidence that the accused or a witness has taken a polygraph is inadmissible, an impermissible reference to a polygraph test can ordinarily be cured by striking the evidence and instructing the jury to ignore it. *United States v. Brevard*, 739 F.2d 180, 182 (4 Cir.1984); *United States v. Holman*, 680 F.2d 1340, 1351–52 (11 Cir.1982); *United States v. Smith*, 565 F.2d 292, 295 (4 Cir.1977). However, a curative instruction is not adequate where the inadmissible evidence is likely to impress a jury to the extent that an instruction from the court will not dissipate its prejudicial effect. *Brevard*, 739 F.2d at 182. To determine whether a curative instruction or a mistrial is the proper response to a reference to a polygraph, the court must consider two factors: "(1) whether an inference about the result of the test may be critical in assessing the witness's credibility, and (2) whether the witness's credibility is vital to the case." *Brevard*, 739 F.2d at 182.

relevant only to the issue of intent, knowledge, lack of mistake, or what have you, and not any evidence of guilt of the Defendant for the crime for which he is standing trial today. During Allen Patterson's testimony, he readmonished:

Mr. Foreman and Ladies and Gentlemen, we're back into the area of alleged similar acts or crimes which are not any evidence of the guilt of any defendant, particularly Mr. Tedder, since this evidence refers to him. It's not any evidence of his guilt of any of the offenses with which he's charged here.

It may be considered by you as you deem it relevant as to the issue of intent, motive, knowledge, or lack of mistake.

Tedder suggests that the emphasis the government placed on the truthfulness of all witnesses testifying pursuant to plea agreements induced the jury to conclude that Allen Patterson and all other cooperating coconspirators had passed a polygraph examination. Under this theory, Patterson's single reference to the polygraph test infected the jury's evaluation of all the evidence and induced the jurors to abdicate their obligation to assess the credibility of the government's witnesses.

■ We do not believe that this limited, inadvertent reference to the polygraph examination of a single witness entitled the defendant to a mistrial. First, the jury heard no evidence as to the results of the test, and while it may have assumed that the test buttressed Patterson's credibility, it also observed him during lengthy direct examination and cross-examination. Thus, even if some jurors drew an inference about the results of the test, there is no special reason in this case to believe that the inference was any more critical in assessing the witness's credibility than it was in cases in which a curative instruction was found to be sufficient. *See Holman,* 680 F.2d at 1352; *United States v. Martino,* 648 F.2d 367, 390 (5 Cir.1981) *Smith,* 565 F.2d at 295. Tedder advances no reason that the proffered curative instruction in this case would not have been as effective as those held sufficient in *Holman, Martino* and *Smith.*

Turning to the second element of the *Brevard* test, we do not doubt that Allen Patterson's testimony was clearly extremely damaging to Tedder, but the jury also heard a great deal of evidence from other sources. Tedder ingeniously argues that Patterson's reference to the polygraph contaminated this evidence as well, but we decline to impute to the jury so tenuous a chain of inferences.[6] By refusing a proffered curative instruction, defense counsel made a tactical decision to forego a remedy that we have repeatedly held to be adequate. This waiver does not entitle defendants to a new trial.

### D. Sufficiency of Evidence and Multiplicity

■ Upon the close of the government's case and in post-trial motions, Tedder moved for judgment of acquittal on Counts One, Two, and Three, charging conspiracy to import marijuana in violation of 21 U.S.C. § 963, conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846, and conspiracy to defraud the Treasury Department in violation of 18 U.S.C. § 371, respectively. Tedder renews these contentions on appeal.

Section 963 of title 21 punishes conspiracy to import controlled substances, such as marijuana, while 21 U.S.C. § 846 prohibits conspiracy to possess such controlled substances with intent to distribute. Essentially, Tedder argues that the evidence adduced at trial is insufficient to make the requisite showing of knowledge and specific intent needed to prove conspiracy. A review of the record indicates that, construed in the light most favorable to the government, sufficient evidence supports the jury's conclusion that Tedder knew of and agreed to the drug scheme. Allen Patterson clearly testified that Tedder knew of the drug smuggling. He also testified that Tedder allowed him to keep a suitcase filled with $250,000.00 in cash in Tedder's trailer and that he and Tedder discussed government surveillance activity in the area. Rocky Bradford testified that Tedder knew of his smuggling activities and that he told Tedder anecdotes about particular occurrences. If, as this evidence

---

**6.** Certainly Patterson's testimony can be distinguished from the testimony in *Brevard* that justified a mistrial. In *Brevard,* a government agent testified, despite repeated admonitions, concerning a polygraph examination of the defendant, who, at trial offered an alibi defense. 739 F.2d at 182. The court made it clear that these factors, i.e., the deliberate defiance plus the alibi, militated heavily in favor of declaring a mistrial due to the introduction of polygraph evidence. *Id.* Here, by contrast, the subject of the polygraph was one of many witnesses who testified for the government. In addition, he made only a single reference to the examination and did not state the results.

indicates, Tedder knew of the drug smuggling, his financial and legal assistance of Allen Patterson and coconspirator Glen Jaeckel constitutes clear evidence of his agreement to facilitate the drug transactions.

Section 371 of title 18 provides in relevant part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Three elements comprise a conspiracy under § 371: "(1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the objectives, and (3) an intent on the part of the conspirators to agree, as well as to defraud the United States." *United States v. Shoup*, 608 F.2d 950, 956 (3 Cir.1979). Section 371 comprehends not only conspiracies intended to involve the loss of government funds but also "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Id.* at 964, *quoting Dennis v. United States*, 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966).

At trial, Glen Jaeckel testified that, at the suggestion of Allen Patterson, he sought advice from Tedder. Tedder went to the Bahamas and established a trust account held by a Bahamian corporation created for that purpose in order to make it harder for anyone to discover that the money belonged to Jaeckel. Jaeckel failed to report income derived from this account to the I.R.S. Based on this evidence as well as additional testimony concerning Tedder's repeated transactions on behalf of Glen Jaeckel and Allen Patterson, the jury had enough evidence from which to draw the inference necessary to convict Tedder under 18 U.S.C. § 371.

■ In addition to challenging the sufficiency of the evidence, Tedder also contends that Counts One and Two on the one hand and Count Three on the other were multiplicitous and that the government should have been required to elect between them. We conclude that this challenge lacks merit.

In *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the Supreme Court established a test of multiplicity. Where each offense requires proof of a fact not required by the other, a defendant can be punished under both statutes for a single act or transaction. *Id; accord Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) (distinguishing a conspiracy to violate two statutes from a single act which violates two statutes). In the instant case, Tedder was convicted of violating three statutes, each of which has an element not common to the others; under 21 U.S.C. § 963, the government must demonstrate the defendant's intent to import marijuana; under 21 U.S.C. § 846, the government must show intent to distribute marijuana; and, under 18 U.S.C. § 371, the government must prove intent to defraud the United States. The Supreme Court has already held that a conspiratorial agreement that envisages both importation and distribution can be punished under both § 846 and § 963, *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), and the defendant does not contend otherwise. The same reasoning leads to the rejection of defendant's complaint about the multiplicity of the drug conspiracies on the one hand and the conspiracy to defraud on the other. In creating separate conspiracy offenses, Congress exercised its constitutional prerogative to establish federal criminal law. In addition, the several conspiracy statutes are directed at distinct evils, suggesting legislative intent to punish them independently. *See Albernaz*, 450 U.S. at 343, 101 S.Ct. at 1144.

Defendant's contention stems from the fact that the prosecution relies on the same evidence to prove each of the conspiracies. This should raise no multiplicity problem;

innumerable inferences can be drawn from the same set of facts. Thus, the government's use of the same evidence to prove each of the special elements required for the three different conspiracies is unexceptionable.

Defendant finds objectionable the use of the evidence of money laundering to support his drug conspiracy convictions. But, as the Second Circuit recognized in *United States v. Orozco-Prada*, 732 F.2d 1076, 1079–83 (2 Cir.1984), money laundering and drug trafficking are often intimately connected. Although the mere handling of proceeds may be insufficient to support a conviction for drug conspiracy, *see Orozco-Prada*, 732 F.2d at 1080, here the government introduced additional evidence indicative of Tedder's knowledge and intent, and this suffices to connect him to the conspiracy and to lend additional probative value to the evidence of money laundering.

### E. Perjury Before the Grand Jury

Tedder was also convicted of five counts of perjury before the Grand Jury, corresponding to five alleged false declarations in his testimony. He contends that his answers were literally true and thus not perjury under *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) (perjury statute not to be invoked against wily witness who succeeds in derailing questioner, so long as witness speaks literal truth).

 Counts 20 and 21 charged Tedder with lying to the grand jury by denying that he traveled to the Bahamas "on behalf of" Allen Patterson and/or his wife. Instead, Tedder claims that he went to the Bahamas on vacation and did the Pattersons a favor by handling some financial transactions for them. At trial, however, Allen Patterson testified that Tedder had traveled on behalf of him and his wife, denying any knowledge that Tedder had pre-existing vacation plans. Finally, upon returning from his Grand Jury appearance, Tedder told Judith Patterson that he had "taken a calculated risk" by denying involvement in Allen Patterson's transactions

with the Bank of Nova Scotia in the Bahamas; Tedder clearly believed that he had testified falsely. From this evidence, plus the jury's own observation of the witnesses' demeanor and assessments of their credibility, a sufficient basis existed on which to find Tedder guilty of perjury on these counts.

Count 19 charged Tedder with testifying falsely by denying that he knew William J. Dunbar to be a fictitious person. Allen Patterson testified that he never told Tedder directly that Dunbar was Patterson's alter ego, but that Tedder might have inferred it. Patterson noted that Tedder rented property from Dunbar but sometimes paid the rent directly to Patterson. Moreover, Tedder's later statements to Judy Patterson that he had perjured himself before the grand jury with regard to Dunbar's existence constitute strong evidence of guilt on this count.

Count 24 charged Tedder with perjury in denying any role in arranging sham loans from any foreign bank to Sea Breeze, one of Allen Patterson's ventures. At trial, Tedder testified that Allen Patterson made all of the arrangements. Patterson testified that he discussed the loan with officials at the Bahamas branch of the Bank of Nova Scotia, but that Tedder made further arrangements on his behalf. When Tedder went to the Bahamas, he had a letter of introduction and a power of attorney from Patterson. Bank records bear this out, and some of Patterson's correspondence speaks in terms of Tedder arranging the transaction. Patterson also testified that Tedder assisted him in typing the loan documents. Most importantly, Tedder admitted his participation in this scheme to Judith Patterson. This suffices to support a conviction on this count.

 The conviction under Count 22, based upon Tedder's denial of personal knowledge of any foreign bank accounts in which Allen Patterson "has" an interest, lies in a different category. The question was apparently asked in the present tense, and Tedder knew of no foreign accounts

held by Patterson at the time he testified, because he believed that Patterson had closed his previous accounts. The government neglected to ask whether Tedder knew of any prior accounts held by Patterson. Tedder's answer was both literally true and fully responsive to the question he was asked. Accordingly, the conviction on this count must be reversed.

### F. Letters Rogatory

Tedder next contends that the business records of the Bank of Nova Scotia, obtained by letters rogatory, were improperly admitted because Tedder had no pretrial opportunity to contest their trustworthiness. The novelty of defendant's claims and the lack of authority interpreting the statutes at issue render this aspect of the case a matter of first impression.

On July 30, 1984, the government deposed Donald Young, Secretary of the Bank of Nova Scotia, in the Bahamas. At that time, Young also produced the bank records here in issue, stating that the records and all entries in the records were kept in the ordinary course of business.

On October 12, 1984, after the deposition but prior to the beginning of trial, Congress enacted 18 U.S.C. § 3505, effective November 12, 1984.[7] Under this statute, the government must promptly notify defense counsel of any intention to offer foreign documentary evidence. A defendant who opposes the use of foreign documentary evidence must, prior to trial, move to oppose the admission of such evidence, and the court must decide the motion before the trial begins. 18 U.S.C. § 3505(b).

In this case, the government provided the requisite notice on November 26, 1984, the day on which pretrial motions were scheduled to be heard. Tedder filed no motion in opposition before the trial began on December 4, 1984. He did file a motion in opposition on January 7, 1985, and the government contends that his failure to object before trial constitutes waiver under the statute.

Defendant apparently contends that since Young's deposition could not have been taken pursuant to 18 U.S.C. § 3505, that statute is completely inapplicable to these proceedings, in which event 18 U.S.C. § 3491, which requires no pretrial motion, controls.[8] Such a construction of the effec-

---

7. 18 U.S.C. § 3505 provides in relevant part:
 Foreign records of regularly conducted activity
 (a)(1) In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that—
 (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
 (B) such record was kept in the course of a regularly conducted business activity;
 (C) the business activity made such a record as a regular practice; and
 (D) if such record is not the original, such record is a duplicate of the original;
 unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
 (2) A foreign certification under this section shall authenticate such record or duplicate.
 (b) At the arraignment or as soon after the arraignment as practicable, a party intending to offer in evidence under this section a foreign record of regularly conducted activity shall provide written notice of that intention

to each other party. A motion opposing admission in evidence of such record shall be made by the opposing party and determined by the court before trial. Failure by a party to file such motion before trial shall constitute a waiver of objection to such record or duplicate, but the court for cause shown may grant relief from the waiver.
(West 1985)

8. Section 3491 of Title 18 provides:
 Any book, paper, statement, record, account, writing, or other document, or any portion thereof, of whatever character and in whatever form, as well as any copy thereof equally with the original, which is not in the United States shall, when duly certified as provided in section 3494 of this title, be admissible in evidence in any criminal action or proceeding in any court of the United States if the court shall find, from all the testimony taken with respect to such foreign document pursuant to a commission executed under section 3492 of this title, that such document (or the original thereof in case such document is a copy) satisfied the authentication requirements of the Federal Rules of Evidence, unless in the event that the genuineness of such

tive date provision of the new statute is completely at odds with similar provisions concerning the effective dates of the Federal Rules of Criminal Procedure and the Federal Rules of Evidence, both of which provide that new rules govern pending proceedings where just and practicable. We think that § 3505 should receive the same construction, and we hold that it was applicble here where just and practicable.

■ If § 3505 controls, we next consider whether the government's letter of November 26, 1984 constituted timely and adequate notice to the defense and whether defendant can establish good cause not to treat his failure to make a pretrial motion as a waiver. Under § 3505, the government must notify the defendant "as soon after the arraignment as practicable" of its intention to offer foreign documents into evidence. Here, Tedder was arraigned on September 20, 1984 and § 3505 took effect on November 12, 1984. The government notified defense counsel of its intent to rely on § 3505 on November 26, 1984, the day previously scheduled for pretrial motions.[9] Thus, the government provided the requisite notice approximately one month after Tedder's arraignment and fourteen days after § 3505 became effective. While the government could have been more diligent in notifying the defense, the lapse between the receipt of notice and the defense motion filed on January 7, 1985 is so great that Tedder's delay in filing his opposition cannot logically be attributed solely to the government's lateness. The defendant should have been able to prepare a relatively simple motion challenging the trustworthiness of the bank records between November 26 and December 4, the date on which the trial began. Even if some slight delay would have been excusable, delay of

more than one month is not. Accordingly, we hold that defendant has waived his evidentiary objections under the statute. 18 U.S.C. § 3505.

### G. Exculpatory Statements

Tedder next contends that his sixth amendment right to cross-examine the witnesses against him was violated when the government blocked his efforts to introduce statements by Allen Patterson tending to exculpate Tedder. Defendant cites two exculpatory statements, as to both of which the government's objection was sustained. Each statement occurred during Patterson's post-arrest conversations with his parents, in which he suggested that Tedder was innocent of at least some of the charges against him. In one case, the district judge ruled that Patterson's arrest terminated the conspiracy, so that Tedder could not rely on the coconspirator exception to the hearsay rule to admit the statement. Similarly, the judge ruled inadmissible Patterson's statement to his mother that "David is innocent of some of the charges," on the ground that it called for a conclusion as to the ultimate issue and was likely to distract the jury. We see no reason to disturb either of these evidentiary rulings.

### H. Jury Instructions

■ In explaining Count 3 regarding fraud on the government, the district judge charged the jury that it is illegal to transfer monetary instruments from foreign banks in order to perpetrate a fraud on the United States by evading the financial reporting requirements. Tedder requested, but was denied, a supplemental instruction that it is not illegal to have and use such

document is denied, any party to such criminal action or proceeding making such denial shall establish to the satisfaction of the court that such document is not genuine. Nothing contained herein shall be deemed to require authentication under the provisions of section 3494 of this title of any such foreign documents which may otherwise be properly authenticated by law.
(West 1985).

9. Tedder suggests that the government failed to provide adequate notice that it would rely on 18 U.S.C. § 3505. Review of the record leads us to reject this contention. In his letter notifying Tedder's counsel of the government's intention to introduce foreign documentary evidence, the Assistant United States Attorney indicated plainly that either 18 U.S.C. § 3491 or 18 U.S.C. § 3505 would support the admission of such evidence.

accounts. Although this is certainly a correct statement of the law and would have highlighted Tedder's theory of defense that the accounts were established for a legal purpose and were then misused by the principals, the legality of the Bahamian accounts was not in issue. Accordingly, the failure to give the requested instruction does not warrant reversal of Tedder's conviction.

### III.

### David Lee Roberts

### Ronald Benson Roberts

David Lee Roberts and Ronald Benson Roberts, brothers, were convicted of conspiracy to import marijuana and conspiracy to possess marijuana with intent to distribute. With the aid of Rocky Bradford, they purchased three vehicles to be used in offloading a shipment of marijuana. Bradford instructed them on how to register the vehicles under fictitious names. The vehicles were kept at Bradford's house until taken to North Carolina for the offload. When the marijuana was scheduled to arrive, the Roberts, together with another coconspirator, drove to the designated "stash house," taking with them equipment for weighing and packaging the marijuana.

The marijuana never arrived, and the Roberts later learned that it had been seized by law enforcement officials. Subsequently, they went to Rocky Bradford's house, where David Roberts made incriminating statements to Bradford's wife, Patrice.

David and Ronald Roberts were found guilty and each received a four-year sentence.

### A. Severance and the Speedy Trial Act

The Roberts contend that, because their motion for severance was wrongly denied, the delay resulting from the consolidation of their trial with the other prosecutions is not excludable time under the Speedy Trial Act, 18 U.S.C. § 3161(h), the time for trial has elapsed, and the case against them must be dismissed. These claims lack merit and require little discussion.

Defendants argue that their motion for severance was wrongly denied because the voluminous evidence of career drug trafficking by others prejudiced their case, denying them a fair trial. They claim that they should have been prosecuted separately because their crime, if any, bears an insufficient relation to the overarching drug scheme to support a joint prosecution. We reject this argument. The Roberts were charged with two separate counts of conspiracy with the other defendants and with unindicted coconspirators. The gravamen of conspiracy is that each conspirator is fully liable for the acts of all coconspirators in furtherance of the conspiracy. Thus, joinder is highly favored in conspiracy cases, over and above the general disposition towards joinder for reasons of efficiency and judicial economy. *See United States v. Parodi*, 703 F.2d 768, 779 (4 Cir. 1983), *citing United States v. Provenzano*, 688 F.2d 194, 199 (3 Cir.1982); *United States v. Papia*, 560 F.2d 827, 836 (7 Cir. 1977); *United States v. Kahn*, 381 F.2d 824, 838 (7 Cir.), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967). Severance under Fed.R.Civ.P. 14 is a matter committed to the sound discretion of the district court, *United States v. Spoone*, 741 F.2d 680, 688 (4 Cir.1984); *United States v. Santoni*, 585 F.2d 667, 674 (4 Cir.1978) *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979). We see nothing to suggest that that discretion has been abused in this case. Accordingly, the delay was properly excluded under 18 U.S.C. § 3161(h)(7), which excludes from the Speedy Trial calculation a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run."

### B. Importation

In *United States v. Manbeck*, 744 F.2d 360 (4 Cir.1984), *cert. denied, sub nom.*, *O'Hare v. U.S.*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985), we held that crew members of a marijuana-laden vessel

could be charged with conspiracy to import marijuana but could not be charged with conspiracy to possess marijuana with intent to distribute, absent additional evidence of their involvement in the distribution scheme. In short, the mere fact that the crew members were transporting and offloading quantities of drugs far exceeding the personal use requirements of the recipients could not, without more, implicate them in a conspiracy to distribute.

On the authority of *Manbeck*, the Roberts brothers ask us to hold that any involvement they may have had in the distribution conspiracy does not render them liable for the importation conspiracy. Not only is *Manbeck* inapposite, it in fact dictates a contrary result.

■ First, *Manbeck* implicitly held that offloading does not constitute distribution but rather is part of the crime of importation. 744 F.2d at 386–87. Thus, since the Roberts apparently purchased the vehicles with the knowledge and intent that they be used in offloading, they participated in a conspiracy to import marijuana. Moreover, the Roberts were conspiring with Rocky Bradford, who acted to arrange the importation in aid of the conspiracy to distribute. Under either of these theories, sufficient evidence supports the Roberts conviction for conspiracy to import marijuana.

### C. Coconspirator's Statement

At trial, Patrice Bradford testified that, after the marijuana had been seized, David Roberts told her that he and Ronald Roberts had awaited the marijuana at the stash house. She testified that Ronald was within earshot and estimated that he was ten feet away. The district court cautioned the jury that the statement could only be used against one who made the statement or one who heard the statement made. The jury heard conflicting testimony about the conditions under which David Roberts made his incriminating statements, and the jury was entitled to conclude that Ronald Roberts heard and adopted David's account.

### D. Remaining Contentions

Finally, the Roberts mount a series of challenges related to the admission of evidence antedating their involvement in the conspiracy; the jury charge; the denial of their motion for acquittal; and their sentences. We see no merit in these assignments of error. Evidence antedating the Roberts' entrance into the enterprise served to show the existence and scope of the conspiracy with which they were charged. The district court adequately instructed the jury that it was obliged to acquit if it concluded that the evidence proved only conspiracies not charged. The motion for acquittal was properly denied because the evidence viewed in the light most favorable to the government provided a basis on which a reasonable jury could find the Roberts guilty of both conspiracy counts. Lastly, while the Roberts may have received a greater percentage of the maximum sentences for which they were eligible than did the other co-conspirators, the sentences were within the statutory limits, *see Dorszynski v. United States*, 418 U.S. 424, 431, 94 S.Ct. 3042, 3047, 41 L.Ed.2d 855 (1974), and the Roberts have not alleged, nor does the record reflect, any abuse of discretion in sentencing.

AFFIRMED IN PART AND REVERSED IN PART.