19 F.3d 1431
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jeffrey WHITEHEAD, Defendant-Appellant.
 No. 93-5437.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 9, 1993.
Decided March 29, 1994.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Bluefield. David A. Faber, District Judge. (CR-92-242-1)
 Argued Michael Eugene Froble, Katz, Kantor & Perkins, Bluefield, WV, for appellant.
 Michael L. Keller, Asst. U.S. Atty., Charleston, WV, for appellee.
 On brief Michael W. Carey, U.S. Atty., R. Brandon Johnson, Asst. U.S. Atty., Charleston, WV, for appellee.
 S.D.W.Va.
 AFFIRMED.
 Before RUSSELL and LUTTIG, Circuit Judges, and KEELEY, United States District Judge for the Northern District of West Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Defendant Jeffrey Whitehead appeals his convictions and sentence on several cocaine charges. We find no error in either and affirm.
 
 
 2
 * In 1991 and 1992, Raphael Garcia (a/k/a "Poncho"), a major drug dealer who resided in New Jersey, operated a large cocaine distribution network in Bluefield, West Virginia. During this period, Poncho made numerous trips to Bluefield to deliver cocaine in kilogram quantities to his dealers there, who then resold it.
 
 
 3
 The federal government indicted Whitehead in September, 1992, on the theory that he served as one of Poncho's dealers in Bluefield. Whitehead was charged with conspiring to distribute cocaine between November, 1991, and September, 1992 (Count 1), distributing cocaine in January, 1992 (Count 2), and possessing cocaine with intent to distribute it in January, 1992 (Count 3), and was tried by himself before a jury.
 
 
 4
 The government's primary witness against Whitehead was Kim Workman, another of Poncho's dealers in Bluefield, who was heavily involved in Poncho's activities. Workman testified after entering into a plea agreement with the government. She stated that Whitehead had on numerous occasions purchased cocaine from Poncho and resold it; Poncho had even told her that she should buy her cocaine from Whitehead when he was unavailable. In addition, Workman described in detail five separate occasions in December, 1991, and January, 1992, when she had purchased from Whitehead cocaine that Whitehead had obtained from Poncho.
 
 
 5
 One of these purchases was the basis for the charges of distributing cocaine (Count 2) and possessing cocaine with intent to distribute it (Count 3). Workman stated that Whitehead had telephoned her at work and told her that he had two ounces of cocaine available for her to purchase. She stopped at Whitehead's house after work and bought one of the two ounces.
 
 
 6
 The government also introduced the testimony of Ronnie Johnson, Whitehead's cousin, who, unbeknownst to Whitehead, was a government informant. Johnson testified that he learned of Poncho's drug operation through Whitehead. When Poncho made his numerous trips to Bluefield from New Jersey, Whitehead called Johnson and asked him to reserve a hotel room from which Poncho could conduct his drug operation. Johnson described a sale of cocaine by Whitehead to another Bluefield drug dealer, Seal Phillips, and stated that he had personal knowledge of three occasions on which Poncho delivered cocaine to Whitehead's house. Johnson also related a harrowing experience where Whitehead held him at gunpoint, threatening: "if you're wired, I'll blow your ... head off."
 
 
 7
 Finally, the government called two other Bluefield residents, Reginald Hairston and Lewis Karnes, who had knowledge of Whitehead's involvement with Poncho's drug operation before the period for which Whitehead was charged in the indictment. Hairston, another Bluefield drug dealer, testified that Whitehead had delivered to him cocaine he had obtained from Poncho in April, 1991. Karnes stated that in June, 1991, he had taken a friend who sought to purchase cocaine to Seal Phillips. Phillips did not have cocaine available, but took Karnes and his friend to Whitehead's house, where the friend made his desired purchase.
 
 
 8
 Whitehead asserted that, while he knew Poncho, he had never been involved in Poncho's drug operation. In pressing this defense, he recalled Workman to impeach her testimony; he also took the stand himself and testified that the statements made by Workman, Johnson, Hairston and Karnes about his selling cocaine that he had purchased from Poncho were complete lies. The jury, however, was unconvinced and convicted Whitehead on all three of the counts charged by the government.
 
 II
 
 9
 The government's witness Workman entered into her plea agreement in March, 1992; immediately thereafter, she met with a police officer and informed him in detail of Whitehead's involvement in Poncho's drug conspiracy. Several months later, she met with an assistant United States Attorney and supplied to him additional information on Whitehead that she had omitted at her original meeting. The government gave Workman a polygraph at the time of this second meeting, which, apparently, she passed.[1]
 
 
 10
 Workman's testimony on direct examination at Whitehead's trial included this additional information which she had not disclosed initially to the government. As part of his subsequent extensive cross-examination of Workman, Whitehead's counsel sought to discredit her testimony by eliciting the fact she had omitted parts of it in her original interview with the government. He initiated the following exchange:
 
 
 11
 Q: And would that information--was that when you provided the additional information about Mr. Whitehead that you left out to begin with?
 
 
 12
 A: Yes, that's when I had to take a polygraph.
 
 
 13
 Q: Your Honor--or excuse me--when did that occur, Miss Workman? When did that occur?
 
 
 14
 A: The polygraph?
 
 
 15
 Q: The conversation. I'll ask the comments about the polygraph be stricken and she be--
 
 
 16
 At this point, Judge Faber interrupted the questioning and instructed the jury to disregard Workman's reference to the polygraph. He rejected, however, Whitehead's argument that the reference prejudiced Whitehead sufficiently to merit a mistrial.
 
 
 17
 Whitehead contends that the district court erred in refusing to grant a mistrial. We disagree.
 
 
 18
 Instructing the jury to disregard evidence that a witness has taken a polygraph usually ameliorates any problem posed by the admission of such evidence. United States v. Tedder, 801 F.2d 1437, 1444 (4th Cir.1986), cert. denied, 480 U.S. 938 (1987); United States v. Brevard, 739 F.2d 180, 182 (4th Cir.1984). Only when this evidence "is likely to impress a jury to the extent that an instruction from the court will not dissipate its prejudicial effect" must the court declare a mistrial. Tedder, 801 F.2d at 1444; accord Brevard, 739 F.2d at 182.
 
 
 19
 Two factors are to be borne in mind in assessing whether the inadmissible evidence of a polygraph test probably etched such an indelible impression on the minds of the jury members as to require a mistrial: "(1)whether an inference about the result of the test may [have] be[en] critical in assessing the witness's credibility, and (2)whether the witness's credibility [was] vital to the case." Tedder, 801 F.2d at 1444 (quoting Brevard, 739 F.2d at 182). Both must be satisfied to mandate a mistrial. See United States v. Herrera, 832 F.2d 833, 836 (4th Cir.1987) (holding that a mistrial was not required when "the witnesses' testimony was clearly vital" but there was "simply no reason to believe that an inference about a polygraph played any significant part in the jury's assessment of credibility").
 
 
 20
 Whitehead's contention that Workman's reference to the polygraph necessitated a mistrial fails under the first factor. Workman merely mentioned in passing that, at one point before the trial, she had taken a polygraph test. This mention--apparently an unintentional mistake by an inexperienced witness, see Tedder, 801 F.2d at 1445 n. 6--occurred within the context of an extensive cross-examination that alone spanned sixty-five pages of trial transcript. See id. at 1445. Never did Workman indicate that she had passed the polygraph or elaborate in any matter on taking it; quite to the contrary, in fact, Judge Faber immediately instructed the jury to disregard Workman's brief mention of it, and it was never again alluded to throughout the three-day trial, see Herrera, 832 F.2d at 836; United States v. Porter, 821 F.2d 968, 974 (4th Cir.1987), cert. denied, 485 U.S. 934 (1988). As a result, even if the jury members did infer from Workman's passing mention of taking a polygraph that she had passed a polygraph, we find it extremely unlikely that this inference played a significant, much less a "critical," Tedder, 801 F.2d at 1444, role in their assessment of her credibility. It was not, therefore,"likely to [have] impress[ed][the] jury to the extent that [Judge Faber's curative] instruction [did] not dissipate its prejudicial effect," id.; consequently, the district court properly rejected Whitehead's request for a mistrial.[2]
 
 III
 
 21
 For the reasons stated, we affirm Whitehead's convictions and sentence.
 
 
 22
 AFFIRMED.
 
 
 
 [1]
 That she passed is not shown in the record; one of the assistant U.S. Attorneys who tried the case stated, however, out of the presence of the jury, that he understood she had
 
 
 [2]
 Whitehead also raises numerous other claims of error but, having examined them thoroughly, we find that they are without merit and reject them without further discussion