328 F.Supp. 233 (1971)
UNITED STATES of America and Leo J. Hanley, Special Agent, Internal Revenue Service, Petitioners,
v.
Edward V. LONG, Respondent.
No. 70 C 639(1).
United States District Court, E. D. Missouri, E. D.
June 17, 1971.
*234 Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., Jeffrey D. Snow, John M. Dowd, Attys., Tax Div., Dept. of Justice, Washington, D. C., for petitioners.
H. G. Stein and C. A. Seigel, St. Louis, Mo., for respondent.

MEMORANDUM
MEREDITH, Chief Judge.
This is an action to enforce an Internal Revenue Service summons which was issued to and served upon the respondent, Edward V. Long, by the petitioner, Leo J. Hanley. This summons sought the testimony of respondent regarding the nature of certain services which he testified were rendered from the year 1964 to and including 1968 to certain clients he testified he had in common with Morris Shenker, the taxpayer under examination. Respondent received a total sum of One Hundred Forty-eight Thousand Dollars ($148,000.00) from Morris Shenker for services respondent stated were rendered to these clients.
The Government contends that the testimony of the respondent is necessary to enable Special Agent Leo J. Hanley of the Intelligence Division and Revenue Agent Edwin Reising to determine the correctness of Shenker's tax return. The determination to be made is whether or not the fees paid to respondent were legitimate business expenses of Morris Shenker, who has deducted them on his tax returns.
The question before this Court is whether or not the respondent should be required to answer questions about the nature of legal services rendered to his clients or whether the nature of the services is privileged under the attorney-client doctrine.
At some time prior to February 10, 1970, the Internal Revenue Service began an investigation into the tax liabilities of Morris Shenker. On February 10, 1970, the Revenue Service served a summons upon Edward V. Long, an attorney, directing him to appear in Hannibal, Missouri, before Special Agent Leo J. Hanley on March 20, 1970, to give testimony relating to the tax liability of Shenker for the periods designated, under the provisions of 26 U.S.C. § 7602 of the Internal Revenue Code of 1954.
Although the summons was for March 20, 1970, by mutual agreement the taking of testimony was postponed to April 17, 1970. Upon administering the oath to respondent on April 17th, Special Agent Hanley made the following statement:
"In accordance with the conversation we had with Mr. McIlroy, your attorney, I would like to have the record show that this testimony is being taken under oath and will be in the form of a question and answer statement; that at the completion of the testimony, it will be reduced to writing, that the transcribed testimony or a copy thereof will be furnished to you, Senator, for your examination, at which time you will be permitted to make such corrections, additions or deletions as you feel are necessary to reflect the proper answers to the questions that I ask and to be sure that the answers were responsive to the questions that I asked. After these corrections, additions or deletions are *235 made, if any, you will then be expected to sign the statement."
At the conclusion of the interview, Special Agent Hanley stated: "We will conclude the interview." Neither of the agents or anyone from the Internal Revenue Service ever communicated with respondent between the termination of the April 17, 1970, interview and the time this proceeding was instituted. Respondent was not furnished a copy of the transcript prior to the time this proceeding was instituted. Suit was filed on December 15, 1970. Thereafter, a copy of the transcript was sent to respondent on January 3, 1971, after he had requested it. This conduct of the petitioners is not condoned by the Court, nevertheless, it does not change the basic issue before the Court.
Respondent testified before this Court and at the April 17, 1970, examination that the late Thelma Manne, Max Lubin, Banner Industries, R. L. Warren and Company, and Associated Life Insurance Company were his clients. On April 17, 1970, upon being asked the type of legal services he performed for these clients, respondent answered that the nature of the work was "general representation." Respondent stated that to pinpoint the kind of representation he had done or work that he had performed would violate the privilege which attaches to the attorney-client relationship.
The respondent's position is two-fold: one, that the summons is functus officio because it became extinguished upon termination of the interview, and, two, the attorney-client privilege applies to the questions propounded to the respondent about the nature of the legal services rendered to his clients. The Government contends that the summons is viable and that the respondent should be required to answer the questions propounded to him by Special Agent Hanley, because the attorney-client privilege does not apply.
The respondent's first contention that the summons is functus officio will be overruled because the summons has not been complied with in full by respondent, so it is the opinion of this Court that the summons is viable.
With respect to the attorney-client privilege, it is the general rule that confidential communications, communicated in the course of professional employment between an attorney and his client, may not, without the consent of the client, be divulged by the attorney. 97 C.J.S. Witnesses § 276 (1957). This is commonly called the attorney-client privilege.
The policy underlying the attorney-client privilege is to promote freedom of consultation of legal advisors by clients, and to remove any apprehension of disclosure by the attorney without the client's consent. Schwimmer v. United States, 232 F.2d 855 (8th Cir. 1956), cert. denied 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956); 8 Wigmore, Evidence 2291 (McNaughton Rev. 1961). Under this policy, a member of the bar is not justified in refusing to testify as to all transactions he may have had with any person whom he chooses to designate as a client. Colton v. United States, 306 F.2d 633 (2nd Cir. 1962).
The privilege applies only if
"(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." United States v. United Shoe Mach. Corp., 89 F.Supp. 357, 358-359 (D.Mass.1950).
The heart of the attorney-client privilege is the substantive matter *236 that is communicated between the client and his attorney. These matters are protected by the privilege. The Court is of the opinion that the only questions about substantive matters that must be answered are questions about the nature of the legal services rendered. These questions require only a response, such as "litigation", "drafting contracts", "tax advice", or "work on domestic relations problems of client". Specific factual inquiry into the communications between attorney and client beyond this is privileged, such as what was said by the client or lawyer in relation to the problem. Colton v. United States, supra; United States v. Kovel, 296 F.2d 918 (2nd Cir. 1961).
Peripheral matters surrounding the relationship, such as who the client is, when and how the relationship was created, when and where matters were discussed, and what the fee arrangement with the client is, are not protected by the attorney-client privilege and may properly be the subject of an inquiry by the Internal Revenue Service. Colton v. United States, supra.
In the case at bar, the respondent has made a blanket claim of privilege as to all communications with his clients and the nature of the work performed by him for them. This Court is of the opinion that the privilege does not extend as far as the respondent would have it extend. It is the opinion of this Court that the Government has a legitimate interest in determining whether or not the fees paid to respondent by Shenker were correctly deducted as attorney fees by Shenker. The answer heretofore given by respondent "general representation" is insufficient.
The Government has submitted to the Court a list of questions which will be submitted to the respondent, if the Court grants the requested relief. These questions are attached to and made a part of this memorandum and are designated as Exhibits A, B, C, D, E, and F. Exhibit A is a list of questions concerning all the clients mentioned in the interview of April 17, 1970. Each of the five remaining exhibits contain a list of questions about each individual client, respectively.
The Court has carefully considered all of the questions in the light of the foregoing discussion. The Court concludes that respondent shall answer in full all the questions set out in Exhibits A, B, C, D, E, and F, with the following exceptions:
Exhibit AQuestions 1, 6, 8, 10, and 25.
Exhibit BQuestions 8 and 14.
Exhibit CQuestion 11.
Exhibit DQuestions 5 and 12.
Exhibit EQuestions 3, 14, and 16.
Exhibit FQuestion 6.
As to the excepted questions, to the extent that they seek information about direct communication between the client and respondent, or information about legal services rendered by the respondent, respondent shall answer with a general response, giving the type of law business discussed. In all other respects, the respondent shall answer the excepted questions with particularity. The Court emphasizes that no specific detail will be required of the respondent, but a full response as to the type of legal service will be required in answer to these questions, or parts of questions. If various different legal matters were involved or worked on for a single client, a response as to each different type of legal service shall be given by respondent. If matters discussed were not legal problems, then respondent shall answer the questions with particularity.

ORDER
A memorandum of this day is hereby incorporated in and made a part of this order.
It is hereby ordered that petitioners' motion to enforce an Internal Revenue Service summons is granted. Respondent should answer fully all of the questions submitted to the Court by petitioners in accordance with the Court's memorandum *237 of this day, within 30 days from date.

EXHIBIT A

General Questions Concerning All Clients
1. What was the general nature of the legal services rendered to each of the five clients?
2. At whose request were these services performed?
3. When and where were these requests made?
4. When and where were the services performed?
5. Were any conferences held with anyone other than the clients and Mr. Shenker regarding the affairs of the clients?
6. If so, give the details of these conferences, including the names of the persons in attendance, dates and places of conferences, and the nature of the matters discussed.
7. Did you prepare, or aid in the preparation of, any memoranda, briefs or other writings for the clients?
8. If so, describe the type of instrument and the circumstances surrounding the preparation.
9. Were any documents you prepared, or aided in preparing, filed with any court or administrative office?
10. If so, who was the client, what was the nature of the instrument and where and when was it filed?
11. Did you ever discuss fees with the clients?
12. If so, with whom, where and when were the discussions held?
13. What was decided in the discussions with the clients concerning fees?
14. What was the percentage which you agreed to receive from the total fees which each client paid to Shenker?
15. Who set the percentage?
16. When and where was it determined?
17. What were the factors that determined the percentage?
18. Did the percentage differ from client to client?
19. If so, why?
20. Could it be determined, when you agreed to represent a client, how much work would be involved?
21. If you couldn't tell how much work was involved with each client, how did you arrive at varying percentages for the individual clients?
22. Do you know the total amount of fees Shenker received from each of the clients?
23. If so, what are the amounts?
24. Do you have any records whatsoever concerning any of the five clients?
25. If so, what do they consist of?
26. How much was received in each year, 1964 to 1968, for representing each client?

EXHIBIT B

Associated Life Insurance Company
1. What position did Mr. Sass hold in Associated Life Insurance Company?
2. What position did Mr. Trager hold in the company?
3. Did you aid in obtaining a license to sell insurance in Missouri for the company?
4. If so, when, where and who did you contact concerning obtaining the license?
5. Did you attempt to obtain a license for the company to sell insurance in any state other than Missouri?

*238 6. If so, when, where and who did you contact concerning obtaining the license?
7. Did you aid in arranging for a stock split for the company?
8. What was the general nature of your services?
9. Do you know the names of the company's house counsel in Chicago?
10. When, where and for what purpose did you ever meet with the company's house counsel?
11. Have you ever owned any of the company's stock?
12. If so, how much and when?
13. When, where and on what occasions have you ever met Mr. Trager?
14. What generally was discussed at these meetings?

EXHIBIT C

Banner Industries
1. What position did Mr. Friedman hold with Banner Industries?
2. What position did Mr. Ross hold with the company?
3. Did you ever contact the Securities Exchange Commission or any other individual or state or federal agency concerning the registration of Banner stock?
4. If so, name the person, the circumstances and the location of such contact.
5. Did you receive all the fees you had coming from Banner Industries?
6. If not, what is the status of their collection?
7. When did Banner Industries discontinue operations?
8. What was the principal business activity of the company?
9. Who was the company's main client or customer?
10. Did Ross ever meet with you in Washington, D. C. concerning Banner Industries' problems?
11. If so, when and what was the general nature of the discussions?
12. Did you ever give any general business advice to Banner Industries?
13. If so, what was the general nature of such advice?

EXHIBIT D

Max Lubin
1. Were any payments you received from Shenker during the years 1964 through 1968 for services rendered Max Lubin?
2. If so, how much and how was it computed?
3. Did you ever give any legal advice to Lubin prior to the time you were appointed Senator?
4. Have you ever traveled in connection with Lubin's business?
5. If so, when and where, and what was the general nature of the business conducted?
6. Who did you contact during such travels?
7. Who was Lubin's attorney prior to retaining Shenker?
8. Did you ever sell a business or any real estate for Lubin?
9. Did you ever contact any third party concerning litigation which Lubin, or his company, was involved in?
10. If so, who and when?
11. Did you perform any services for the purchase and sale of the Dunes Hotel in Las Vegas, Nevada?
12. If so, what was the general nature of the services rendered?
13. Do you still represent Mr. Lubin?

*239 EXHIBIT E

Thelma Manne
1. Did you ever orally speak to Mrs. Manne about what your fee would be in representing her in any matter?
2. Did you participate in any manner in the sale of Artistic Furniture Company stock?
3. If so, when, where and what was the general nature of the services rendered?
4. Why did you become associated with Mr. Shenker in representing Mrs. Manne?
5. Did Mrs. Manne request it?
6. If so, when, where and what were the circumstances?
7. Did you receive any payments from Shenker for services rendered to Mrs. Manne prior to her death?
8. If so, when, how much and how was it computed?
9. When were you paid for any services rendered to Mrs. Manne?
10. Was any other attorney, other than Shenker, ever involved in any of the matters which you handled for Mrs. Manne?
11. If so, when, where and what was the general nature of the services rendered by such attorney?
12. Did you ever prepare a will for Mrs. Manne?
13. If so, when and where was the will prepared?
14. When, where and under what circumstances and for what purpose was the last time you talked with Mrs. Manne?
15. Did you ever render any legal services for Mrs. Manne's husband?
16. If so, when, where and what was the general nature of the services rendered?
17. Were you paid for such services?
18. If so, when and how much money did you receive?

EXHIBIT F

R. L. Warren and Company
1. Did you ever contact the Securities Exchange Commission, or any other individual, or state or federal agency on behalf of R. L. Warren and Company?
2. If so, name the person, the circumstances and the location of such contact.
3. What position did Mr. Friedman hold in R. L. Warren and Company?
4. What position did Mr. Glassman hold in the company?
5. Did you ever provide any financial or general business advice to the company?
6. If so, to whom, when and where, and what was the general nature of the advice given?
7. What position did Shenker occupy with the company?
8. Did you collect all of your fees from the company prior to its merger with White and Company?
9. If not, what is the status of their collection?
10. What was the company's principal business activity?
11. Did the company specialize to any degree, and if so, in what activity?