The **CHESAPEAKE & OHIO RAILWAY COMPANY and the Baltimore & Ohio Railway Company, Plaintiffs,**

v.

**George B. KIRWAN and Edward F. Lind, Defendants.**

**Misc. No. 88–3–H.**

United States District Court, S.D. West Virginia, at Huntington.

June 27, 1988.

D. Christopher Ohly, Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., Baltimore, Md., for plaintiffs.

Cheryl A. Eifert, Susan E. Morton, Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, W.Va., for witness, Henry Middleton Kayes.

James L. O'Connell, Trial Attorney, Cincinnati, Ohio, Fred B. Westfall, Jr., Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.Va., for plaintiffs/counterclaim defendants.

George B. Kirwan, Huntington, W.Va., pro se.

Thomas R. Smith, Cincinnati, Ohio, for defendant Lind.

## MEMORANDUM ORDER

MAURICE G. TAYLOR, Jr., United States Magistrate.

This matter is presently pending before

the Court on motion of plaintiffs [1] seeking an order directing Henry Middleton Kayes, an attorney, to comply with a subpoena *duces tecum* requiring the production of documents at his deposition. The dispute arises out of litigation pending in the United States District Court for the Southern District of Ohio at Cincinnati and the parties are before this Court in conformity with the provisions of Rule 37(a)(1)—Mr. Kayes not being a party to that litigation and his deposition being conducted in this district.

In the underlying litigation, plaintiffs have filed a multiple count complaint against George B. Kirwan and Edward F. Lind, former employees, in which it is alleged, *inter alia*, that defendants fraudulently deprived plaintiffs of various sums of money. Insofar as pertinent to decision on the present motion, the complaint alleges that, at a time when Kirwan and Lind were employed by the railroad, they caused certain corporations to be established, that by virtue of their positions they were able to and did direct business of the railroad to various entities or vendors, and that in return for directing business to such entities their corporations were paid a percentage of the money paid by the railroad to the vendors. Plaintiffs allege that as a "result of the false and fraudulent representations, pretenses and promises, and as a direct and proximate result of the concealment of material facts which Kirwan and Lind had a duty to disclose, the Railroad was deprived and defrauded of its right to the loyal, faithful, conscientious, disinterested and unbiased services, actions and performance of its employees, free from bribery, corruption, partiality, willful omission, bias, dishonesty, deceit, misconduct and fraud; of its right to be informed of all relevant and pertinent facts and circumstances when transacting business with others; and of money and property to the full extent of the amounts paid to Analytics, Inc., Rail Services for Profit, Inc. and other companies formed by the defendants...."

Mr. Kayes and members of his firm performed the legal services necessary to incorporate defendants' businesses and some additional work following their formation. By means of the deposition and subpoena *duces tecum* plaintiffs seek documents generated by Mr. Kayes and members of his firm during the course of their employment. A number of documents have been produced; however, several were withheld on the basis of a claim of attorney-client privilege. In order to resolve the matter, the Court conducted a hearing during which the documents were submitted for *in camera* inspection. Counsel for plaintiffs was provided with an index or list describing generally the documents provided and arguments were presented as to particular documents as well as types or classes of documents. Plaintiffs contend that, with regard to a number of the documents, the privilege has been waived, that others do not involve confidential communications from client to attorney, and that, as a group, the documents fall within the crime-fraud exception and thus are not entitled to the protection accorded confidential communication by the attorney-client privilege. The Court has now conducted its review and concludes that a number of the documents do not involve confidential communications. Additionally, with certain exceptions, the documents as a group fall outside the protection of the attorney-client privilege by reason of the fact that plaintiffs have made a *prima facie* showing that counsel's services were obtained by Lind and Kirwan in order to assist them in a scheme to defraud the railroad.

It is important to note at this point that Mr. Kayes and his firm were not aware of defendants' purposes and plaintiffs do not contend otherwise. Counsel was simply performing services normally performed for clients who are seeking to incorporate businesses. That counsel was unaware of the purpose for which services were sought, however, does not affect the ultimate conclusion that the privilege is inap-

---

**1.** Plaintiffs, subsidiaries of CSX Corporation, are hereinafter sometimes referred to collectively as "the railroad".

plicable. Counsel's knowledge of his clients' purpose is simply not a factor in this case. *See, In re Grand Jury Investigation,* 640 F.Supp. 1047, 1050 (S.D.W.Va. 1986).

■ Based upon plaintiff's submissions, and apart from the documents submitted for *in camera* inspection, evidence presented would support findings as follows:[2]

In 1983, at a time when they were employed by the railroad, Edward F. Lind and George B. Kirwan caused to be incorporated Analytics, Inc. (hereinafter ("Analytics"), Rail Services for Profit, Inc. (hereinafter "Rail Services"), and Transportation Chemicals, LTD (hereinafter "Transportation"). Rail Services was incorporated on August 18, 1983, Analytics on September 13, 1983, and Transportation on December 6, 1983. Kirwan and Lind were the only stockholders of Analytics and Rail Services—each receiving 500 shares of the 1,000 shares issued by the corporations. Of the 1,000 shares apparently issued by Transportation, Lind received 250 shares, Kirwan 250 shares and two other individuals received the remaining 500 shares. Analytics and Rail Services each had a two-member board of directors, *i.e.,* Kirwan and Lind. Kirwan's employment with the railroad terminated in early 1984; however, Lind remained employed until March of 1986. He was apparently employed by the railroad in August of 1982 and from February of 1983 until the termination of his employment in March of 1986, was "the Railroad's Chief Mechanical Officer." Analytics[3] and Rail Services, according to their charters, were to engage in the consulting business "relating to ... transportation, by rail and other modes of transportation, of materials and equipment."

Plaintiffs allege that a number of the railroad's vendors paid fees to defendants' corporations and evidence with regard to various payments has been presented. Only one transaction has been completely documented and that stems from payments by BDM Corporation, a corporation which cleaned and repaired cars for the railroad. On November 1, 1985, BDM issued a check to "Analytics LTD." in the amount of $8,571.67. It was indicated on the check that the money was being paid as a "Consulting Fee For October 1985." Mr. Kirwan does not deny receipt of this check, or of a number of others; however, he points out that at the time payments were made he was no longer an employee of the railroad, was not subject to its ethics code, and, as a former employee, was not in a position to direct railroad business to particular vendors. As for Mr. Lind, who was then a railroad employee, both he and Mr. Kirwan have maintained that Lind surrendered all shares of his stock in the corporations to Kirwan on November 17, 1983, that thereafter Lind had no interest in the corporations, and that he has not received any benefit from income they may have earned.

Lind's relationship to the three corporations is clearly central to plaintiffs' claims and the defenses tendered by defendants. Copies of stock certificates of Analytics and Rail Services issued to Lind are a part of the record and these certificates contain an endorsement indicating that Lind sold or assigned his shares on November 17, 1983. Lind's signature assigning the shares was, in each instance, witnessed by Mr. Kirwan. Plaintiffs contend that these endorsements were only a continuation of the scheme to defraud, that Lind remained an owner of the corporations, that the assignments

---

**2.** This Court does not find, as a fact, that defendants have committed fraud or that their purpose in securing the services of counsel was in aid of the commission of a fraud. These matters will be resolved at trial. Plaintiffs' burden, one which they have satisfied, is to establish a *prima facie* case of fraud, *i.e.,* production of evidence which, if believed, is sufficient to support a finding that counsel's services were secured for the purpose of committing fraud. *See, Coleman v. American Broadcasting Companies, Inc.,* 106 F.R.D. 201, 207 (D.D.C.1985); *In re International Systems and Controls Corpora-*

*tion Securities Litigation,* 693 F.2d 1235, 1242 (5th Cir.1982); *In re Grand Jury Subpoenas Duces Tecum,* 773 F.2d 204, 206–07 (8th Cir.1985); *In re Sealed Case,* 754 F.2d 395, 399 (D.C.Cir. 1985). *See also, In re John Doe,* 662 F.2d 1073, 1079–80 (4th Cir.1981), *cert. denied* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982).

**3.** Of the three corporations, Analytics appears to have been the only one to engage in any substantial activity.

were made long after November of 1983, and that the defendants simply "back dated" the date of assignment. Considerable evidence has been presented by plaintiffs in support of their position.

That Lind's signature, and date of execution, was witnessed by Kirwan is a circumstance which lends less than complete credibility to defendants' assertions cannot be denied. This, however, is not the only evidence which casts doubt on the November 17, 1983 date. The transfer was not recorded on the corporation's books until 1986. Further, documents generated in conjunction with the preparation of 1984 tax returns of Analytics, Rail Services and Transportation indicate continuing stock ownership by Lind. A letter to Kirwan from counsel indicates that in September of 1985 Kirwan was taking steps to transfer ownership of Lind's stock. Perhaps the most telling piece of evidence, however, is a November 30, 1983 letter from Deborah Waterman, an employee of Henry Kayes law firm, to Excelsior–Legal Stationary Co. In this letter, Ms. Waterman ordered "one Black Beauty No. 70 All–In–One Corporate Outfit" for Analytics, informing Excelsior that "there are to be One Thousand (1,000) shares of common capital stock having a par value of One Dollar ($1.00) each, for a total authorized capital of One Thousand Dollars ($1,000.00)." Quite clearly, Lind could not have executed the assignment on November 17, 1983 on certificates of stock which had yet to be obtained by counsel. Lind's continuing relationship, at least to Analytics, is further evidenced by the fact that on November 4, 1985, following the issuance of the $8,571.67 check from BDM Corporation to "Analytics, LTD." on November 1, 1985, Kirwan deposited $4,285.50 in his account at the C & O Credit Union

and had a cashier's check issued to E.F. Lind for the same amount.[4]

The parties are in agreement that, in this diversity case, West Virginia law with respect to attorney-client privilege governs. Rule 501, Fed.R.Ev. While there are not a great number of state cases in point, principles generally applied to the privilege have been adopted in West Virginia,[5] including the crime-fraud exception,[6] and Rule 501, W.Va.R.Ev., in similar fashion to its federal counterpart, provides that the privilege "shall be governed by the principles of the common law except as modified by the Constitution of the United States or West Virginia, statute or court rule."

For purposes of the present decision, the Court need not delve deeply into the history or development of the attorney-client privilege, it being sufficient to note its ancient lineage, its absolute protection, when applicable, of confidential communications, and, concomitantly, the fact that, because the privilege impairs "the fact-finding process" which is "at the heart of the adversary system," it is strictly construed by the courts. *Coleman v. American Broadcasting Companies, Inc., supra* at 204–05.[7] For definitional purposes, the formulation set forth in *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950) has received general acceptance,[8] Judge Wyzanski concluding that:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of the court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to

---

**4.** Kirwan transacted most business for the corporations by cash and cashier's checks.

**5.** *See, State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129, 135–36 (1979).

**6.** *See, Thomas v. Jones,* 105 W.Va. 46, 141 S.E. 434, 437 (1928).

**7.** As Professor Wigmore has admonished, "the privilege remains an exception to the general duty to disclose. Its benefits are all indirect

and speculative; its obstruction is plain and concrete. * * *. It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961).

**8.** *See, United States v. Tedder,* 801 F.2d 1437, 1441–42 (4th Cir.1986), *cert. denied* — U.S. ——, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987).

a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

■ The Court is principally concerned with the question of whether the services of counsel were sought for the purpose of committing "a crime or tort" and to a lesser extent with the issue of whether communications were related to counsel "without the presence of strangers", *i.e.*, were confidential and not intended to be disclosed to others. With regard to the crime-fraud exception, case law, as well as proposed, but unadopted Rule 503(d)(1) of the Federal Rules of Evidence,[9] establish that consultations with counsel for the purpose of initiating or furthering a criminal or fraudulent scheme will not be shielded by the attorney-client privilege. *Union Camp Corporation v. Lewis*, 385 F.2d 143, 144 (4th Cir.1967). Considerations of policy, as well as the definitional language of the privilege, dictate that such communications be excluded from the protections accorded by the privilege. Mere allegations of fraud will not, of course, require disclosure, and the moving party is required, as has been noted, to make a *prima facie* showing. In the eloquent phraseology of Justice Cardoza, "to drive the privilege away, there must be 'something to give colour to the charge;' there must be '*prima facie* evidence that it has some foundation in fact.'" *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933). Plaintiffs have, in the Court's view, given "colour" to the charge of fraud. Evidence establishes creation and operation of the corporations at a time when both Lind and Kirwan were employed by the railroad, attempts to conceal defendants' relationship with their corporations, dealings by defendants' corpora-

tions, unbeknownst to the railroad, with railroad vendors, and payments or income received by defendants from such vendors at a time when Mr. Lind was employed by the railroad in a position of authority. The evidence concerning these transactions, if unrebutted, clearly establishes a factual basis which would support a finding that defendants engaged in a scheme to defraud the railroad and that the incorporation of their businesses was a significant part of the scheme. Having concluded that a *prima facie* case of fraud is established by the evidence, the Court does not reach the question of whether defendants' acts could be characterized as criminal. Plaintiffs assert, however, that defendants' act violated Ohio criminal statutes,[10] and federal criminal statutes may also be implicated. *See,* 49 U.S.C. § 11907 (West 1988).

■ Apart from the crime-fraud exception, a number of the documents submitted for *in camera* inspection are not shielded from disclosure by the attorney-client privilege. The edited portions of counsel's invoices and supporting documents describe, in very general terms, the work performed. Such information is not protected by the privilege. *United States v. Long*, 328 F.Supp. 233, 235–36 (E.D.Mo.1971); *United National Records, Inc. v. MCA, Inc.*, 106 F.R.D. 39, 40 (N.D.Ill.1985); *In re LTV Securities Litigation*, 89 F.R.D. 595, 603 (N.D.Texas 1981). Accordingly, without regard to the crime-fraud exception, documents numbered 2, 3, 3A, 3B, 3C and 3D are discoverable in unedited form.

■ Several documents, or parts of documents, contain information not derived from confidential client communications or, though the information was provided by clients, it has either been revealed or was intended to be revealed to others and, as a consequence, is not protected. *See, United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir.1984). Falling within this category are documents numbered 1 and 72 [11] and

---

**9.** *See, United States v. (Under Seal)*, 748 F.2d 871, 874 n. 5 (4th Cir.1984).

**10.** The BDM check was mailed to South Point, Ohio.

**11.** Even if the Court were to find the existence of a "joint defense", the letter from Lind's counsel does not contain information derived from confidential client communications.

parts of the following documents: paragraphs 1, 3 and 4 of number 11; paragraphs 1, 2 and the final unnumbered paragraph, in red ink, of number 20; and the first line in number 21.

■ With regard to the "unexecuted documents" and underlying data, note is taken of the Court's decision in *United States v. (Under Seal), supra* at 875–76, in which it was concluded that, when an attorney is employed "to research the *possibility* of filing public papers" and the "client subsequently decides not to publish," the privilege is maintained. The facts of the present case, insofar as Rail Services is concerned, are distinguishable. Documentation indicates that counsel was directed to prepare, have executed, and file these "unexecuted documents", but that Mr. Kirwan subsequently changed his mind. At the time the information was imparted to counsel, however, it was intended that that information and the documents generated were to be filed. Intent at the time the information is imparted is the determinative factor and was the basis for refusing to accord privileged status to attorney-client communications concerning a prospectus for investors in *In re Grand Jury Proceedings*, 727 F.2d 1352, 1354 (4th Cir. 1984), though the prospectus involved was never prepared or issued—counsel being instructed shortly after he was retained "to discontinue his services." An expansive construction of the privilege might encompass such information; however, as the Court pointed out in *In re Grand Jury Proceedings, supra* at 1358, since "the privilege itself is not 'favored' and is to be 'strictly confined within the narrowest possible limits' ", information intended to be disclosed to others is not shielded though, because of subsequent events, the publication, filing or communication envisioned never transpires. Accordingly, without regard to the crime-fraud exception, the following documents, withheld under the unexecuted document claim, would not be protected from discovery by the privilege: documents numbered 16 and 17; paragraph 3 of document number 20; last phrase in document number 23; those portions of documents numbered 37, 51, 52, 56, and 65

relating to Rail Services; documents contained in file numbered 73 which relate to Rail Services.

■ One category of documents—those relating to communications with counsel in response to the grand jury proceedings—is not germane to and is severable from the scheme to defraud. These documents concern what may be described as discussions of "past incidents" as contrasted with the furtherance of a scheme to defraud and would, therefore, not be discoverable under the crime-fraud exception. *See,* 24 Wright & Graham, Federal Practice and Procedure: Evidence § 5501 at 508–09; *In re Sealed Case,* 754 F.2d 395, 402 (D.C.Cir. 1985); *Coleman v. American Broadcasting Companies, Inc., supra* at 206. Since these documents clearly involve confidential communications between client and counsel, and the Court perceives no basis for finding waiver, they are protected by the privilege and not subject to discovery. Falling within this category are documents numbered 4, 5, 6 and 7.

In summary, all documents now being withheld, with the exception of documents numbered 4, 5, 6 and 7, are discoverable under the crime-fraud exception. Further, those documents and parts of documents, previously noted, which do not involve confidential communications are discoverable without regard to the crime-fraud exception, as are the Rail Services unexecuted documents.

Accordingly, except for documents numbered 4, 5, 6 and 7, plaintiffs' motion will be granted, the documents produced for inspection and copying, and it is so ORDERED. The Court will return the documents to counsel and counsel shall, within seven days from the date of entry of this Order, make the same available to counsel for plaintiff for inspection and copying.