**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jose Ignacio HERRERA, a/k/a Joey;**
**Luis Mario Herrera, a/k/a Louis,**
**Defendants–Appellants.**

No. 86–5662.

United States Court of Appeals,
Fourth Circuit.

Argued July 10, 1987.

Decided Nov. 2, 1987.

Joel Hirschhorn, Miami, Fla., Michael Tarre, Coral Gables, Fla., for defendants-appellants.

Joseph Charles Wyderko, Dept. of Justice, Washington, D.C. (Samuel T. Currin, U.S. Atty., John Stuart Bruce, Asst. U.S. Atty., Raleigh, N.C., on brief), for plaintiff-appellee.

Before RUSSELL, WIDENER and HALL, Circuit Judges.

K.K. HALL, Circuit Judge:

In this consolidated appeal, Jose Ignacio Herrera and Luis Mario Herrera ("the Herreras") seek to challenge their convictions on a variety of drug-related charges stemming from their alleged participation in a lengthy conspiracy to import marijuana into the United States. Appellants were convicted of aiding and abetting a continuing criminal enterprise in violation of 21 U.S.C. § 848 and 18 U.S.C. § 2; conspiring to import marijuana in violation of 21 U.S.C. §§ 963 and 960; importing marijuana in violation of 21 U.S.C. § 952; and traveling in interstate commerce to promote and carry out unlawful activity in violation of 18 U.S.C. § 1952. Finding no reversible error in the proceedings below, we affirm their convictions.

I.

At a two-week jury trial held in the Eastern District of North Carolina in July and August of 1986, the government sought to prove that the Herreras had functioned as organizers of a continuing criminal enterprise operating in North Carolina between 1979 and 1981. The government alleged that the criminal conspiracy had been involved in five ventures whereby attempts were made to smuggle marijuana from Colombia into the United States. According to the government's witnesses, the scheme utilized "mother ships" to transport the drugs from South America and smaller "offloading" vessels to bring the cargo ashore.

The government charged that the Herreras' enterprise first attempted unsuccessfully to import marijuana in the spring of 1979. When the effort involving a mother ship known as the *Hydra* failed, a second, successful attempt was launched in the winter of 1979 utilizing a mother ship named the *Fabrizia*. The enterprise allegedly then continued its illegal activity with operations involving the *Hydra* in the fall of 1980 and another mother ship, the *Southwind* in December of 1980. The last activity of the enterprise with which the Herreras were allegedly involved occurred in April of 1981 when the mother ship, the *Dudley*, transported 50,000 pounds of marijuana into the Oregon Inlet area of eastern North Carolina. The *Dudley* was seized by the authorities before its cargo could be fully offloaded.[1]

---

1. The government relied upon the incidents involving the *Hydra,* the *Fabrizia* and the *Southwind* to establish the existence of a continuing criminal enterprise in violation of 21 U.S.C. § 848. All other charges involving those shipments were barred by the five-year statute of

The Herreras were brought to trial on July 21, 1986, along with five codefendants. On July 24, 1986, four of the codefendants pleaded guilty to one count of the indictments returned against them and were removed from the proceedings. The Herreras immediately moved for severance. The motion was denied and the court instructed the jury that the case against the four codefendants had been resolved "in a manner which will dispense with your having to decide those cases." The jury was further instructed that it should disregard any statements on cross-examination by counsel for the codefendants. The trial then resumed.

The Herreras steadfastly maintained their innocence of all charges, asserting that they were innocent businessmen who happened to know Frank Converse, the alleged ringleader of the smuggling scheme. The government could provide little physical evidence, and instead relied primarily upon the testimony of seven codefendants, Harold Dean Harrelson, Jack Lee Sprat, Jose Prieto, Eugene Andrews, Robert Mattock, Donnie Millis, and Rodney Hemmrich. The codefendants, who testified pursuant to plea agreements, all asserted that the Herreras were actively involved with the planning, financing and execution of all five importation ventures.

In conjunction with the codefendant testimony, the government introduced into evidence the full text of the witnesses' plea agreements. The Herreras objected to the introduction of the agreements, arguing that a phrase therein stating that "the defendant agrees to submit to a polygraph examination regarding matters about which he is interviewed ..." improperly allowed the government to vouch for the credibility of its witnesses. The district court, however, allowed the agreements into evidence after learning that the defense intended to cross-examine the witnesses with regard to their plea arrangements. The court also obtained assurances from the government that no polygraph tests had in fact been given and that absolutely no reference to the polygraph provision would be made.

At the conclusion of the trial, the jury found the Herreras guilty of aiding and abetting a continuing criminal enterprise, conspiring to import marijuana, importing marijuana and traveling in interstate commerce to carry out an unlawful activity. Jose Herrera was sentenced to a total of twenty years imprisonment and fined $140,000. Luis Herrera received a sentence of fifteen years imprisonment and a fine of $10,000. This appeal followed.

## II.

On appeal, the Herreras contend that the errors committed by the trial court were of sufficient magnitude to require a reversal of their convictions and a new trial on all charges. Specifically, they argue that the trial court erred in admitting the full text of the plea agreements of the government's witnesses and in denying their motion for severance. Appellants also argue that the court improperly allowed a handwriting expert to offer an unduly speculative opinion based upon "a high degree of belief." Finally, appellants contend that the trial court should have dismissed the charges of violating "the Travel Act," 18 U.S.C. § 1952, when the evidence established only one instance of travel rather than a "continuous course of conduct." Although we agree that references to polygraph tests in plea agreements introduced into evidence are improper, we find the error harmless in this instance. We further find that appellants' remaining contentions are totally without merit.

In *United States v. Porter*, 821 F.2d 968 (4th Cir.1987), we agreed with a view originally expressed by the Eleventh Circuit in *United States v. Hilton*, 772 F.2d 783, 786 (11th Cir.1985), that evidence of plea agreements containing provisions relating to possible polygraph testing constitutes improper bolstering of a witness's testimony. Even assuming, however, that the rule in *Porter* is to be applied retroactively in this

limitations provided by 18 U.S.C. § 3282. The remaining charges against the Herreras were based on their alleged participation in the *Dudley* venture.

instance,[2] the decision does not require that appellants be granted a new trial. We expressly noted in *Porter* that improper reference to polygraphs in plea agreements was subject to a harmless error analysis. *Porter*, 821 F.2d at 974.[3] Although the present factual circumstances render the assessment of potential harm somewhat more complicated than that applied in *Porter*, we are similarly persuaded that appellants have suffered no prejudice from the introduction of the plea agreements at their trial.

■ Our determination of harmless error in *Porter* rested in large part upon the fact that there was sufficient extrinsic evidence of the defendant's guilt without the testimony of the plea bargaining witness. We also noted that the witness's testimony was otherwise corroborated. Obviously, the same analysis cannot be applied in the present circumstances where the government's case relied almost totally upon the testimony of the codefendant witnesses. Rather than simply excluding the testimony of the purportedly tainted witnesses, we must decide whether the jury's independent assessment of that testimony was potentially impaired by references to the polygraph testing. We conclude that it was not.

In *United States v. Tedder*, 801 F.2d 1437 (4th Cir.1986), we found that a mistrial was not automatically required when a government witness testified that he had actually taken a polygraph test. Instead, we concluded that the necessity of a mistrial was to be determined in accordance with two factors: "(1) whether an inference about the result of the test may be critical in assessing the witness's credibility, and (2) whether the witness's credibility is vital to the case." *Tedder*, 801 F.2d at 1444, quoting *United States v. Brevard*, 739 F.2d 180, 182 (4th Cir.1984).

The application of the two-factor test from *Tedder* and *Brevard* to the present appeal conclusively demonstrates the harmlessness of the single reference to a polygraph in the witnesses' plea agreements. Although the witnesses' testimony was clearly vital, there is simply no reason to believe that an inference about a polygraph played any significant part in the jury's assessment of credibility. Beyond the one mention of possible testing in the text of the plea agreements, absolutely no reference was made to polygraphs by the government. Nor was it ever suggested by the government that any tests were actually given.[4] Moreover, each of the seven witnesses was subjected to rigorous cross-examination, allowing the jury to weigh the plausibility of the accusations against appellants individually and in combination. Certainly, when multiple witnesses all provide a similar, consistent, and coherent account of events, there is significantly less likelihood that the jury will rely on government bolstering than when the prosecution has relied upon one or two key witnesses. Finally, the trial court expressly cautioned the jury that plea agreements often give government witnesses a motive to testify falsely and that the jury should weigh such testimony carefully.

We fully expect that in the future, the government will either remove the polygraph provisions from its plea agreements or that trial courts will carefully redact the offending portions in conformity with our decision in *Porter* before admitting the agreements into evidence.

### III.

■ The appellants' remaining contentions do not merit extensive discussion. A defendant's motion for a severance or a mistrial after a codefendant pleads guilty during a joint trial is a matter addressed to the sound discretion of the trial court.

---

2. Our decision in *Porter* was announced on June 22, 1987, nearly a year after the Herreras' trial.

3. Indeed, in *Porter,* we found the error to be harmless after distinguishing the absence of any oral reference to the provision by the prosecutor in that case from the active reliance on the

polygraph provision by the prosecution in *Hilton.*

4. In contrast, the defense on cross-examination asked each witness whether he had taken a polygraph test. The witnesses all expressly testified that they had not been tested.

*United States v. Johnson*, 451 F.2d 1321 (4th Cir.1971). In this instance, the jury was never told that the codefendants had pled guilty. Instead, the court stated that the case against the codefendants had been "disposed of" and that absolutely no inferences were to be drawn from that disposition. In light of the thorough and carefully drawn curative instruction, we can see no abuse of discretion in the court's decision to deny severance and to proceed with the trial of the remaining defendants.

█ We likewise see no merit in appellant's contention that the court erred in admitting the testimony of the government handwriting expert. It appears that the trial court did not initially intend to allow the government's expert to testify that he had a "high degree of belief" that the handwriting on a North Carolina motel receipt signed at the time of the *Dudley* incident was that of Luis Herrera. When the testimony took that form, however, the court was not compelled to strike it as "speculative." An expert opinion regarding handwriting need not be based upon absolute certainty in order to be admissible. *United States v. Baller*, 519 F.2d 463 (4th Cir.1975). It was well within the bounds of sound discretion for the court to allow the jury to weigh the probative value of the somewhat equivocal opinion.

█ Finally, we reject appellants' contention that a violation of the Travel Act, 18 U.S.C. § 1952, requires more than a single act of interstate travel. Clearly, the travel must be part of an effort to promote a continuous enterprise and not merely an isolated crime, *United States v. Monu*, 782 F.2d 1209 (4th Cir.1986). Nothing in the statutory language, however, requires that the travel be repeated or systematic if the underlying enterprise is proven.[5] Indeed, as we noted in *dicta* in *United States v.*

*Corbin*, 662 F.2d 1066, 1073 n. 16 (4th Cir.1981), involvement in a criminal enterprise "may be integral even though limited to one instance."

The evidence against appellants demonstrated both the existence and their participation in an extensive drug importation scheme. Even one act of travel in furtherance of such an operation is far more than "casual sporadic involvement in criminal activity." *Id.* Rather, it is the precise conduct which the Travel Act seeks to deter. We, therefore, see no error in the district court's refusal to dismiss the charge based on that statute.

### IV.

For the foregoing reasons, the criminal convictions of appellants Jose Ignacio Herrera and Luis Mario Herrera are affirmed.

AFFIRMED.

---

5. 18 U.S.C. § 1952 states in pertinent part, that
    (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
    (1) distribute the proceeds of any unlawful activity; or
    (2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2) and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.