976 F.2d 728
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Juana SUAREZ-MILIAN, Defendant-Appellant.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Ruben Leon GUZMAN, Defendant-Appellant.
 No. 91-5158. 91-5159.
 United States Court of Appeals,
Fourth Circuit.
 Argued: July 9, 1992
Decided: October 5, 1992
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Senior District Judge. (CR-91-122-A)
 ARGUED: Melvin Sidney Black, Miami, Florida, for Appellant.
 Julie Anne Blink, Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 ON BRIEF: Melvyn Greenspahn, Miami, Florida, for Appellant.
 Richard Cullen, United States Attorney, Janet Reincke, Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 E.D.Va.
 Affirmed.
 Before NIEMEYER, HAMILTON, and WILLIAMS, Circuit Judges.
 WILLIAMS, Circuit Judge:
 
 OPINION
 
 1
 Juana Suarez-Milian and Ruben Leon Guzman appeal their convictions for distributing and conspiring to distribute cocaine in violation of 21 U.S.C. §§ 841(a) and 846 (1988). Defendants assert two grounds for reversal: (1) the voir dire was insufficient to permit the intelligent exercise of peremptory challenges and thereby impanel an impartial jury; and (2) the Government improperly bolstered the testimony of a witness. Finding no reversible error, we affirm.
 
 
 2
 * In late 1990 the Drug Enforcement Agency arrested Nicholas Adamo on drug-related charges. After his arrest, Adamo agreed to cooperate with the DEA, and revealed that he had been purchasing narcotics from Juana Suarez-Milian for six to eight years and had also been purchasing drugs from Ruben Guzman since 1989. Adamo arranged a meeting between DEA agent Douglas Crooke and SuarezMilian at her home in Miami, Florida. While at Suarez-Milian's home, they discussed a drug transaction and she showed Crooke and Adamo one kilogram of cocaine. Crooke informed Suarez-Milian that he did not have the money to purchase the cocaine that day, and asked if she could arrange to have the cocaine delivered to the Washington, D.C., area. Crooke gave Suarez-Milian his beeper number to notify him when the arrangements were complete.
 
 
 3
 After that meeting, Adamo returned to Suarez-Milian's home where he met with both Suarez-Milian and Guzman. Adamo testified that Suarez-Milian and Guzman agreed to send Fernando Gonzalez to Washington to deliver the cocaine. The following day, Crooke telephoned Suarez-Milian about the drug deal. About a week later, Crooke phoned and spoke with Guzman about the arrangements for the delivery to Washington. Crooke tape-recorded both phone conversations, and the recordings were played for the jury during trial. Adamo identified the voices on the tape as belonging to Crooke, Suarez-Milian, and Guzman.
 
 
 4
 In later conversations, Crooke continued to discuss the delivery arrangements with both Suarez-Milian and Guzman, and gave Guzman a code number for Gonzalez to use when he contacted Crooke. Guzman informed Crooke that Gonzalez would call him upon arriving in Washington with the cocaine. On March 4, 1991, using the beeper number Crooke had given Suarez-Milian, Gonzalez called Crooke and they arranged a meeting in northern Virginia. The following day, Gonzalez delivered four kilograms of cocaine to Crooke and was immediately arrested. Shortly thereafter the Defendants were arrested in Miami. A jury trial was held and the jury returned a verdict of guilty against both Defendants on all counts.
 
 II
 
 5
 Suarez-Milian and Guzman first argue that their convictions should be reversed because the voir dire conducted by the district court was insufficient in two respects. First, the Defendants object to the district court's refusal to ask questions related to whether members of the venire would view the Defendants' failure to testify as an indication of guilt. Second, they contest the court's refusal to inquire further into the legal training of two members of the venire.[1] They argue that the failure to ask these additional questions made the voir dire inadequate and prevented them from intelligently exercising their peremptory challenges.[2] We review the district court's refusal to ask specific voir dire questions for abuse of discretion. United States v. Brooks, 957 F.2d 1138, 1144 (4th Cir.), cert. denied, 112 S. Ct. 3051 (1992).
 
 
 6
 In order to ascertain whether the district court should have asked the requested questions, we must first examine the questions actually posed to the venire panel. Among other things, the district court asked, "Do any of you have any legal training?"[3] (J.A. at 7.) Two members of the venire responded in the affirmative. The district court asked the name of the first veniremember, an attorney, and then asked if anyone else had responded. A second veniremember spoke up and gave her name. Although the district court did not request any additional information from her, she volunteered that she worked for the government as a paralegal specialist. At this point, the Defendants made no objection and requested no additional information from either veniremember.
 
 
 7
 The district court continued its inquiry by asking whether any members of the venire had any preconceptions of the guilt or innocence of the Defendants, whether they or a family member had served as a law enforcement officer or were connected with a law enforcement agency in any way, whether they had any reason to be prejudiced against the Government, or whether they had any exceptionally strong feelings about drug crimes. Again, no veniremember responded affirmatively to any of these questions. The final question asked of the full venire was, "[d]o you know of any reason whatsoever why you cannot sit with absolute impartiality to both the Government and the defendants as trial jurors in the case?" (J.A. at 8.) No affirmative response was given.
 
 
 8
 At the conclusion of the voir dire, the district court stated: "I have considered the questions submitted by the defendants, but I think I have asked enough questions to insure an impartial panel, and I find the panel to be free of exception. We will call the first 12 jurors by lot." (J.A. at 9.) The Defendants did not then object that the voir dire had been inadequate, nor did they move to strike any veniremember for cause. The clerk proceeded to call twelve members of the venire by name and number.[4] The court requested that counsel approach the bench and the Government immediately struck two jurors, one of whom was the attorney.
 
 
 9
 Only after the Government had already exercised two peremptory strikes did defense counsel express to the court his feeling that it was "extremely important" to ask several more questions. Specifically, defense counsel sought to discover the veniremembers' opinions regarding a defendant's failure to testify and wanted more information about "Juror No. 1,"[5] the attorney, and his law practice. In response, the court stated: "I will not ask any further questions than I have asked." (J.A. at 10.) Defense counsel then noted an objection, stating: "Your Honor, just for the record, let me just voice an objection. I don't feel that I was allowed enough information on the jurors to make an intelligent decision." (J.A. at 11.)
 
 
 10
 During the impaneling of the jury, the paralegal was called to sit on the jury and the defense exercised a peremptory strike to remove her. Defendants exhausted all of their strikes.
 
 
 11
 * The initial issue we must address is whether Defendants timely stated their objection to the district court's voir dire in order to preserve it for appeal. The Government asserts that the Defendants did not object until after the voir dire had concluded, and was therefore untimely under our decision in United States v. LaRouche, 896 F.2d 815 (4th Cir.), cert. denied, 496 U.S. 927 (1990). Although we think it is a close case, we hold that the Defendants' objection was timely.
 
 
 12
 In LaRouche, we held that "a specific objection or request during the voir dire process is required to preserve the objection for appeal." 896 F.2d at 829 (emphasis added) (citing King v. Jones, 824 F.2d 324, 326 (4th Cir. 1987)). In LaRouche, the district court conducted voir dire and then stated: "Gentlemen, I think I have asked enough questions to insure an impartial panel." Id. at 829. Because the defendants did not object to the voir dire at its conclusion, we held that the defendants had waived any objections to its potential inadequacy. Id. The Ninth Circuit has established a similar rule of waiver. See United States v. Blosvern, 514 F.2d 387, 389 (9th Cir. 1975) (complete failure to request additional voir dire waives objection); cf. Horsey v. Mack Trucks, Inc., 882 F.2d 844, 849 (3d Cir. 1989) (failure to preserve record demonstrating timely objection to inadequate voir dire constitutes waiver).
 
 
 13
 The Ninth Circuit has aptly summarized the rationale behind requiring a contemporaneous objection to inadequate voir dire:
 
 
 14
 In preparing a list of proposed questions to jurors, counsel will often submit questions which are also such that the court could well decide to use them, but which are such that it cannot be an abuse of discretion to fail to use them. If there are particular questions that counsel deems essential, and such that refusal to put them may be reversible error, counsel must tell the court so, and state his reasons, before the examination of the jurors is completed.
 
 
 15
 Blosvern, 514 F.2d at 389; see also King v. Jones, 824 F.2d at 326 (following Blosvern ). In each of these cases, the defendants either failed to assert any objection at trial to the voir dire or failed to specify crucial areas of inquiry. Here, Defendants did not request additional voir dire until after the district court had declared the venire free of exception, after the court had called the first group of twelve prospective jurors for striking, and after the court had accepted two peremptory challenges from the Government.[6] Nonetheless, although the Defendants did not state an objection at the earliest possible moment, they objected with sufficient timeliness to give the district court an effective opportunity to remedy any perceived errors.
 
 
 16
 Federal Rule of Criminal Procedure 24(a)[7] vests substantial discretion in the district court regarding the voir dire process, and we have specifically held that "[a] trial court has wide latitude in conducting voir dire." United States v. Muldoon, 931 F.2d 282, 286 (4th Cir. 1991). Here, the district court treated the objection as timely, and spoke to the merits in denying Defendants' request for additional information. We see no reason to disturb that decision.
 
 B
 
 17
 We next address whether the district court abused its discretion by refusing to ask three questions relating to the Defendants' failure to testify and by refusing to follow up another question related to the legal training of the veniremembers. Defendants argue that without the information they would have gained from the veniremembers' responses to these questions, they could not intelligently exercise their peremptory challenges. We find, however, that the district court did not substantially impair the Defendants' right to exercise their peremptory challenges when it refused to expand voir dire.
 
 
 18
 The Supreme Court has recently affirmed that "peremptory challenges are not constitutionally protected fundamental rights," but rather are "means to the constitutional end of an impartial jury and a fair trial." Georgia v. McCollum, 112 S. Ct. 2348, 2358 (1992); see also United States v. Rucker, 557 F.2d 1046, 1048 n.4 (4th Cir. 1977) ("The right of peremptory challenge ... is conferred by Congress and the Federal Rules of Criminal Procedure, and is not required by the Constitution."). Indeed, "[t]he essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel." United States v. Brown, 799 F.2d 134, 135 (4th Cir. 1986) (internal quotations omitted); see also Morgan v. Illinois, 112 S. Ct. 2222, 2230 (1992) ("part of the guaranty of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors"). The right to peremptory strikes, though not constitutionally protected, is "a right of such significance that denial or substantial impairment of the right constitutes per se reversible error." United States v. Ricks, 802 F.2d at 734 (quoting Swain v. Alabama, 380 U.S. 202, 219 (1965)).
 
 
 19
 We believe that the right to impanel a fair and impartial jury is not substantially impaired merely because a district court chooses not to inquire into the veniremembers' opinions about every legal principle relevant to the case, including the fundamental tenet that a defendant's failure to testify is no indication of guilt. The Defendants' right to an impartial jury can be sufficiently protected by thorough jury instructions. In United States v. Clarke, 468 F.2d 890, 891 (5th Cir. 1972) (per curiam), the Fifth Circuit concluded that instructing the jury to disregard the defendant's failure to testify sufficiently protected his right to an impartial jury. Id. (citing Bruno v. United States, 308 U.S. 287 (1939)). See also United States v. Cowles, 503 F.2d 67, 68 (2d Cir. 1974) (per curiam) (no abuse of discretion to decline question regarding failure to testify), cert. denied, 419 U.S. 1113 (1975). Accordingly, when a district court fails to inquire into the veniremembers' acceptance of basic principles of criminal law, we must consider the adequacy and thoroughness of the district court's charge to the jury in determining whether the district court abused its discretion. See United States v. Evans, 917 F.2d 800, 807 (4th Cir. 1990) (jury charge can cure failure to inquire into important issues on voir dire); see also United States v. Cosby, 529 F.2d 143, 149 (8th Cir.) (jury instruction adequate to protect defendant's procedural rights), cert. denied, 426 U.S. 935 (1976); United States v. Goodwin, 470 F.2d 893, 898 (5th Cir. 1972) ("[F]ailure to ask a requested Rule 24(a) question does not amount to an abuse of discretion if the court's general questions, coupled with its charge to the jury, afford a party the protection sought."), cert. denied, 411 U.S. 969 (1973). In the related areas of the presumption of innocence and proof beyond a reasonable doubt, we have held that it is not reversible error for district courts to refuse to pose voir dire questions about those principles. See United States v. Robinson, 804 F.2d 280, 281 (4th Cir. 1986); see also United States v. Carter, 772 F.2d 66, 67 (4th Cir. 1985); United States v. Ledee, 549 F.2d 990, 992 (5th Cir.) (not error "to refuse to allow inquiries of jurors as to whether they can accept certain propositions of law"), cert. denied, 434 U.S. 902 (1977).
 
 
 20
 Because the jury charge[8] in this case thoroughly covers the implications of the Defendants' refusal to testify, we find no abuse of discretion in refusing to ask questions on this subject in voir dire.
 
 C
 
 21
 Defendants' second objection to the adequacy of voir dire is that they were denied additional information about the two members of the venire who responded that they had some legal training. The Defendants acknowledge that the district court did ask their proposed question about legal training, but object more specifically to the court's failure to conduct further inquiry of the attorney and the paralegal. They argue that without additional information about these persons, they could not reasonably exercise their peremptory strikes.
 
 
 22
 Defendants clearly suffered no prejudice from their lack of additional information about the attorney. The Government struck the attorney before the Defendants expended a single peremptory challenge. Further information about the attorney and his law practice could not have helped the Defendants in exercising their strikes.[9]
 
 
 23
 Defendants' contention that they were entitled to more information regarding the legal training of the paralegal is similarly meritless. The key issue is whether such information is relevant to her impartiality. In a case involving mail fraud, the Eleventh Circuit held that the district court did not abuse its discretion by refusing to ask questions regarding the venire's educational background and reading materials. United States v. Bosby, 675 F.2d 1174, 1184 (11th Cir. 1982). The district court "need only inquire into those areas suggested by counsel that are calculated to elicit information necessary to make an informed decision concerning the acceptance of or dismissal of a juror." Id. Because questions regarding the venire's educational background would not have revealed bias or prejudice that would necessitate dismissal, no inquiry was necessary. Id.
 
 
 24
 Moreover, we have previously held that the fact that a juror or his relative may have been the victim of a crime unrelated to the offense being tried is only "minimally relevant" to the question of juror impartiality. United States v. Jones, 608 F.2d 1004, 1007 (4th Cir. 1979), cert. denied, 444 U.S. 1086 (1980). We held that the district court did not abuse its discretion when it refused to ask prospective jurors whether they had been victims of "any crime." Id. Similarly, in the context of a garden variety drug prosecution, we think that the scope of a prospective juror's legal training is"minimally relevant," and failure to conduct further questioning is not an abuse of discretion.
 
 
 25
 Defendants argue that United States v. Brown, 799 F.2d 134 (4th Cir. 1986), supports their position. In Brown we held that the district court abused its discretion when it refused to ask prospective jurors whether they knew any of the possible witnesses. Id. at 136. Fourteen witnesses testified at trial; nine were employees of the Navy and three were law enforcement officers. Five veniremembers were also employees of the Navy and one was a law enforcement officer. Id. Given the substantial likelihood that some members of the venire might know one or more witnesses, the district court's failure to ask the veniremembers if they were acquainted with any of the witnesses impaired the meaningful exercise of peremptory strikes and provided no "reasonable assurance that bias and partiality would be discovered if present." Id. at 137.
 
 
 26
 The Defendants have suggested no inquiry that the district court should have made of the paralegal to reveal bias or partiality. While in Brown "determining whether any of the prospective jurors [knew] the witnesses [was] clearly important to the question of the jurors' impartiality," id. at 136, here we see no similarly important question that the district court omitted from its voir dire.
 
 
 27
 Defendants also cite United States v. Rucker, 557 F.2d 1046 (4th Cir. 1977), to support their argument that further inquiry was necessary. In Rucker, the jury questionnaire revealed two veniremembers who responded either affirmatively or ambiguously to a question regarding physical or mental impairment. Id. at 1047. After a specific request from the defendant, the district court declined to explore these answers in greater depth. Id. We held that further inquiry was necessary in Rucker because "[p]hysical or mental incapacity to serve, no less than the existence of bias, strikes at the very fitness of a venireman to sit as a juror." Rucker, 557 F.2d at 1047-48 (footnote omitted). Defendants have failed to identify any details of the veniremember's paralegal training that would have "stricken at her fitness" to serve on this jury. When defendants seek to explore on voir dire matters that do not relate to recognized sources of bias, they must lay an adequate foundation for their questions. Questions should be"reasonably calculated to discover an actual and likely source of prejudice." Robinson, 475 F.2d at 381; see also United States v. Barnes, 604 F.2d 121, 138 (2d Cir. 1979) (some suggestions of bias may be too remote to require inquiry), cert. denied, 446 U.S. 907 (1980). The Defendants have offered no justification for their assertion that further inquiry into the paralegal's educational background would discover prejudice or bias. Absent such a showing, the district court did not abuse its discretion in refusing to make further inquiries.
 
 
 28
 A careful review of the voir dire conducted by the district court demonstrates no abuse of discretion. The voir dire was adequate to impanel an impartial jury and provided sufficient information for the reasonable exercise of the Defendants' peremptory strikes.
 
 III
 
 29
 As a second ground for reversal, Defendants argue that the Government used several improper means to bolster the credibility of its informant: (1) Agent Crooke's testimony that Adamo had been honest; (2) the introduction into evidence of Adamo's plea agreement, which contained both promises of truthfulness and references to his willingness to submit to a polygraph examination; (3) the Government's reference to the plea agreement during its closing argument; and (4) the Government's profession of a personal belief in Adamo's truthfulness.
 
 
 30
 At trial, Defendants did not object to any of these alleged errors and therefore did not properly preserve them for appeal. United States v. Parodi, 703 F.2d 768, 783 (4th Cir. 1983). Federal Rule of Criminal Procedure 52(b) limits our ability to review errors not properly brought to the attention of the district court.[10] "[F]ederal courts have consistently interpreted the plain-error doctrine as requiring an appellate court to find that the claimed error not only seriously affected 'substantial rights,' but that it had an unfair prejudicial impact on the jury's deliberations. Only then would the court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice." United States v. Young, 470 U.S. 1, 16 n.14 (1985). In evaluating an alleged error, we must consider the entire record. Id. at 16.
 
 
 31
 Defendants first assert that DEA agent Crooke improperly bolstered Adamo's credibility by testifying that he believed Adamo to be truthful. We find this assertion wholly without merit. The alleged bolstering occurred on redirect examination by the Government. The Government asked Crooke, "[f]inally, you were asked whether you believe Nick Adamo to be truthful. Do you recall that?" (J.A. at 138.) Crooke replied affirmatively. Crooke's testimony was clearly an acknowledgement of his earlier cross-examination by defense counsel regarding Adamo's credibility. Defendants had specifically questioned Crooke whether he ever had occasion to doubt Adamo's veracity. His affirmative answer to the Government's question indicated only that Crooke recalled that cross-examination.
 
 
 32
 Second, Defendants contest the admission of Adamo's plea agreement into evidence. Because the plea agreement contains promises by Adamo to submit to a polygraph examination[11] and to testify truthfully, Defendants maintain that its admission into evidence is plain error.
 
 
 33
 Suarez-Milian and Guzman strenuously attacked Adamo's credibility in their opening statement and throughout the trial. Because Defendants put Adamo's credibility at issue by questioning his motives in signing a plea bargain, it was not plain error for the district court to allow the Government to introduce into evidence portions of the agreement in order to rehabilitate Adamo. See United States v. Bowie, 892 F.2d 1494, 1499 (10th Cir. 1990); United States v. Rosson, 441 F.2d 242, 244 (5th Cir.) ("If the defense relies upon the existence of the plea bargain to attack the credibility of the witness, it is not then entitled to preclude the jury from being apprised of additional matters relevant to the bargain so as to leave an incorrect inference that the witness has made a better bargain for himself ... than in fact he has made."), cert. denied, 404 U.S. 843 (1971).
 
 
 34
 Even a concerted attack upon the credibility of a witness, however, does not necessarily give the Government license to introduce the agreement in its entirety. More than once we have held that "evidence of plea agreements containing provisions relating to possible polygraph testing constitutes improper bolstering of a witness's testimony." United States v. Herrera, 832 F.2d 833, 835 (4th Cir. 1987); United States v. Porter, 821 F.2d 968, 974 (4th Cir. 1987), cert. denied, 485 U.S. 934 (1988); see also United States v. Hilton, 772 F.2d 783, 786 (11th Cir. 1985). In Hilton, the government argued to the jury that it should believe the Government's key witnesses specifically because they agreed to take polygraph examinations. The Eleventh Circuit held that the government's argument deprived the defendants of a fair trial. Hilton, 772 F.2d at 786. We relied on Hilton to reach our holding in Porter that admission of a plea agreement referring to a polygraph examination was error. Porter, 821 F.2d at 974. We nonetheless distinguished Hilton, however, on the ground that the prosecutor in that case specifically "contended in final argument that crucial witnesses were credible because they had agreed to take polygraph exams." Id. We concluded that the error in Porter was harmless because (1) the government made no other reference to either the agreement or the polygraph, (2) other evidence was sufficient to convict the defendant, and (3) the testimony of the improperly bolstered witness was otherwise corroborated. Id.
 
 
 35
 In this case, the Government never mentioned Adamo's agreement to submit to a polygraph, but only admonished the jury in closing argument to read the plea agreement. Similarly, in Herrera, the government made no specific reference to the polygraph clauses in its witnesses' plea agreements. 832 F.2d at 836. Even though the defendants in Herrera timely objected to the introduction of the plea agreements, we held that the defendant suffered no prejudice and that the error was harmless. Id. Although Herrera recognized that the testimony of the improperly bolstered witnesses was "clearly vital," we upheld the convictions on the ground that "there is simply no reason to believe that an inference about a polygraph played any significant part in the jury's assessment of credibility." Id.
 
 
 36
 In support of our finding of harmless error in Herrera, we noted that Porter called for an evaluation of the extent of corroborating evidence and the existence of sufficient independent evidence of guilt. Id. Similarly, in light of the substantial corroborating testimony provided by Agent Crooke, the tape recordings of incriminating conversations with both Suarez-Milian and Guzman, and the curative instructions by the district court,[12] we hold that the reference in the plea agreement to a polygraph examination, while error, did not impair Defendants' substantial rights.
 
 
 37
 In addition to challenging the reference to polygraph testing in Adamo's plea agreement, the Defendants contest the admission of other promises in the agreement that he would testify truthfully or else suffer penalties for failing to comply with the provisions of the plea. In addressing this challenge, we need only refer again to the Eleventh Circuit's opinion in Hilton, which we find persuasive. The Hilton court said:
 
 
 38
 If the witness' credibility is not attacked, the clauses of the plea agreement in which the witness promised to testify truthfully should be redacted before the document is admitted in evidence unless the admission of the plea agreement is not questioned. If the credibility is attacked on crossexamination, then the witness' promise to testify truthfully may be shown on redirect examination by the government.
 
 
 39
 Hilton, 772 F.2d at 787. The admission of these portions of the plea agreement was not plain error.
 
 
 40
 Third, Defendants challenge the following portion of the Government's closing argument:
 
 
 41
 And as far as Nick Adamo's deal with the prosecution, with the Government, his deal is to tell the truth, and his plea agreement is in evidence. And look at it when you get back in the jury room, ladies and gentlemen. It says that you are obligated to testify truthfully at all times, and it says that if you lie, Nick Adamo, you can be prosecuted for further offenses. Nick Adamo doesn't get anywhere by lying. He goes to jail for a longer period of time.
 
 
 42
 (J.A. at 315.) The Defendants argue that reference to Adamo's deal "to tell the truth" was improper bolstering. We agree with the Tenth Circuit's conclusion in Bowie that "[u]se of the 'truthfulness' portions of these agreements becomes impermissible vouching only when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony." 892 F.2d at 1498. Here, the Government merely summarized the provisions of the agreement that penalize Adamo for lying. In United States v. Binker, 795 F.2d 1218, 1225 (5th Cir. 1986), cert. denied, 479 U.S. 1085 (1987), the Fifth Circuit held that once the defense suggests that a witness lied because of his plea agreement, the prosecution is justified in arguing that the plea agreement gave the witness an incentive to tell the truth. We do not believe the Government's statements do anything more than counteract the Defendant's closing argument that Adamo lied to get favorable treatment from the Government.
 
 
 43
 Finally, Defendants argue that the Government improperly bolstered Adamo's testimony by professing a personal belief in his truthfulness. During closing argument, the Government tried to undermine each defense offered by Suarez-Milian and Guzman. In particular, Defendants challenge the highlighted statements in the following passage:
 
 
 44
 Another defense is Nick Adamo is a liar. They spent plenty of time telling you not to believe Nick Adamo. Well, first off, ladies and gentlemen, Nick Adamo didn't lie. You have [sic] the opportunity yesterday to sit up here and see this man testify. You can form your own judgments about credibility, and I submit to you that you saw a person telling you the truth ....
 
 
 45
 But there is another way that you can tell that Nick Adamo was being straight with you, and that's because everything that Nick Adamo testified to was corroborated. There was independent evidence supporting what he said.
 
 
 46
 (J.A. at 314) (emphasis added.) When placed in context, the seemingly improper statements amount to nothing more than an argument that credibility was an important issue in the case, and that the evidence supports the inference that Adamo testified truthfully. The use of these statements did not undermine the fairness of the Defendants' trial and does not constitute plain error.
 
 
 47
 Even if we considered that, cumulatively, the Government's statements were improper, any improprieties were cured by the district court's jury charge. The court specifically instructed the jury that "[s]tatements and argument of counsel are not evidence in this case." (J.A. at 322.) See Binker, 795 F.2d at 1226 (a jury instruction helps to counteract prejudicial statements by prosecutor). Moreover, the court openly suggested to the jury that the plea agreement was entitled to no deference, and should be viewed skeptically in light of Adamo's obvious incentive to provide false evidence that favored the Government.[13] See Herrera, 832 F.2d at 836 ("the trial court expressly cautioned the jury that plea agreements often give government witnesses a motive to testify falsely and that the jury should weigh such testimony carefully").
 
 
 48
 The Supreme Court has noted that "the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " United States v. Young, 470 U.S. 1, 15 (1985). We believe this case involves no miscarriage of justice, and decline to invoke the plain error doctrine to reverse the district court's judgment.
 
 IV
 
 49
 In conclusion, we hold that the district court conducted sufficient voir dire to allow the Defendants to exercise their peremptory challenges intelligently and to impanel an impartial jury. Although the introduction of a Government witness' plea agreement containing references to a polygraph examination was error, Defendants did not properly preserve their objection to its admission. We find that the error was harmless and did not undermine the fairness of the trial.[14] Defendants' other assertions that the Government improperly bolstered the credibility of their informant are without merit. The judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 More particularly, the Defendants point to the following questions submitted to but not asked by the district court:
 
 
 [31]
 You understand, do you not, that the burden of proving the defendant guilty beyond a reasonable doubt rests with the prosecution, and that the accused need not introduce any evidence whatsoever?
 
 
 [32]
 Knowing that, would you require the accused at any time to satisfy you as to their innocence?
 
 
 [33]
 And, knowing that, do you realize that the defendant is not bound to explain her side of the case since the burden of proof does, in fact, rest with the prosecutor? So, that you would not consider the accused's failure to testify as an indication of guilty, would you?
 
 
 [64]
 Does any member of this jury panel have any prior experience in law or legal training, whether formal or informal?
 (Appellants' Br. at 14.) The district court did ask, however, whether there were any members of the venire "who cannot accept without reservation that in a criminal case a defendant is presumed by law to be innocent, and that presumption remains with him unless and until the Government proves his guilt by proof beyond a reasonable doubt?" (J.A. at 7.)
 
 
 [2]
 At oral argument, Defendants did not assert that there was a likelihood that the responses to these questions would reveal any information that would support a challenge for cause
 
 
 [3]
 This question is substantially the same as Defendants' proposed question number 64. See supra, note 1
 
 
 [4]
 The district court employed the"jury box" system of jury selection. See United States v. Ricks, 802 F.2d 731, 733 (4th Cir.) (en banc) (explaining differences between the "jury box" system and the "struck jury" system), cert. denied, 479 F.2d 1009 (1986)
 
 
 [5]
 Defense counsel apparently confused Juror No. 1, a female paralegal, and Juror No. 38, a male attorney. Counsel stated: "Also, Your Honor, based upon some of the answers that we have gotten from the questioning such as Juror No. 1, an attorney, I would like to find out what kind of attorney he is, what kind of law practice he has and things of that nature." (J.A. at 10 (emphasis added).) Defense counsel did not request information on any other subject. We infer that he was otherwise satisfied with the voir dire
 
 
 [6]
 In arguing against waiver, Defendants state in their briefs that "[f]urther argument to [the district court] could have been greeted with a contempt citation." Appellants' Brief at 21. We wish to clarify that such a possibility does not excuse an attorney's failure to object." It is incumbent upon counsel to make his record for appeal even if he believes that objecting to the actions of judge or counsel will give offense either to the court or to the jury. In order for us to review challenges of the district court's rulings, the district court must be advised by counsel on the record of his objection and of the relief requested." Hicks v. Mickelson, 835 F.2d 721, 724 (8th Cir. 1987), quoted with approval in Horsey, 882 F.2d at 848
 
 
 [7]
 Rule 24(a) provides:
 The court may permit the defendant or the defendant's attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or the defendant's attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.
 (Emphasis added.)
 
 
 [8]
 The relevant portions of the jury instructions are as follows:
 In a criminal case, the burden is on the prosecution to prove each of these elements by proof beyond a reasonable doubt before there can be a conviction. The law does not impose upon a defendant in such a case the burden of producing any evidence or calling any witnesses.
 ...
 You are told that whenever a defendant comes into Court charged with a crime, he is presumed by law to be innocent.... That presumption is an abiding one, and remains with the defendant throughout the trial unless and until the defendant is proven guilty of the crime charged by credible evidence beyond a reasonable doubt.
 The burden of proving a defendant guilty beyond a reasonable doubt rests upon the Government. This burden never shifts throughout the trial. The law does not require a defendant to prove his innocence or to produce any evidence. If the Government fails to prove a defendant guilty of a charge beyond a reasonable doubt, then you must find him or her not guilty of that charge.
 ...
 Nor should the fact that a defendant did not testify prejudice a defendant. A defendant has the absolute right not to testify, and the jury must not draw a presumption of guilt or any inference against a defendant because he or she did not testify.
 (J.A. at 329, 336-37, 338 (emphasis added).)
 
 
 [9]
 Moreover, the defendants did not make, and the court did not deny, the request to reopen voir dire until after the Government had already stricken the attorney. Thus, when the defense objected on the basis that he wanted further information on the attorney, the district court could easily have decided that further inquiry into the attorney's background and law practice was moot
 
 
 [10]
 Rule 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."
 
 
 [11]
 The plea agreement recites, in part:
 The defendant, NICHOLAS FRED ADAMO, understands and agrees that compliance with this plea agreement requires his full and truthful disclosure to this office and law enforcement agents of the United States. If required by this office the defendant shall provide complete information and shall testify truthfully and fully before the Grand Jury and at any trial or court proceeding. The defendant also agrees to submit to a polygraph examination at the request of the United States Attorney.
 (J.A. at 393.)
 
 
 [12]
 See infra note 13
 
 
 [13]
 The district court further instructed:
 The United States has introduced one person-principally Adamo, that has allegedly-well, actually has provided evidence against the defendant for immunity for punishment or personal advantage, or pursuant to a plea agreement or expected benefit. It is a general principle in considering such testimony that it should be - that it is open to suspicion, that such persons may be actuated by self-interest, that such testimony should be carefully weighed and tested before giving it unlimited credence, and that it is not safe to accept it as conclusive unless it is corroborated by the testimony of other persons or by facts and circumstances clearly tending to support it.
 ...
 In assessing the credibility of such a witness who has entered into a plea bargain or plea agreement, you should consider whether the witness who testified in the case is testifying truthfully or is testifying falsely in order to obtain favorable consideration from the Government or other disposition of his own case....
 With reference to such disposition of charges after a plea or other discussion, the important point is not whether there has been a plea agreement, but whether the witness who has entered into such an agreement is testifying truthfully as to the participation of the defendants in the events referred to, or whether he has been influenced to testify falsely by the plea agreement itself.
 (J.A. at 335-36.)
 
 
 [14]
 We stand by our statement in Herrera that " [w]e fully expect thatin the future, the government will either remove the polygraph provisions from its plea agreements or that trial courts will carefully redact the offending portions in conformity with our decision in Porter before admitting the agreements into evidence." 832 F.2d at 836. We have settled the law on this point, and further admissions of plea agreements that refer to polygraph examinations only serve as the foundation for unnecessary appeals